**Daniel Lee WAINSCOTT, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Supreme Court of Kentucky.

Feb. 21, 1978.

Rehearing Denied April 11, 1978.

Jack Emory Farley, Public Defender, David E. Murrell, Deputy Public Defender, Edward C. Monahan, Asst. Public Defender, Frankfort, for appellant.

Robert F. Stephens, Atty. Gen., Mark F. Armstrong, Asst. Atty. Gen., Frankfort, for appellee.

JONES, Justice.

Daniel (Danny) Lee Wainscott appeals from a judgment sentencing him to life imprisonment pursuant to a jury verdict finding him guilty of murder under the provisions of KRS 507.020(1).

There are numerous other questions, but the principal issues deal with whether Danny was sane at the time he committed the offense and whether his confession was voluntary. To dispose of these and other issues, it is necessary to detail some of the evidence presented to the jury. The depositions, pre-trial motions, five volumes of evidence and the exhibits portray a sordid

account of the brutal murder of Brenda Woolums Winters, at her home on Juniper Drive in Frankfort on July 24, 1976.

Danny killed Brenda. He told the jury in detail how he did it. His testimony varies to some degree from the confession he made to the state police four days after Brenda's murder. He contends, however, the confession was coerced. His justification for the homicide at trial and in the confession was nebulous. A part of the confession Danny made to state detective, Bill Young, at 7:15 P.M., July 27, 1976, depicts Danny's macabre act and attitude on the morning of July 24, 1976, when he murdered Brenda.

The stark reality of what happened on that July morning is contained in the following portion of Danny's confession:

"I, *Daniel L. Wainscott* (signed), make the following free and voluntary statement to Detective Bill Young known to me to be a member of the Kentucky State Police. I have been advised that I do not have to make a statement and that anything I say can be used in court against me. I have also been advised of my rights to see an attorney. No threats or promises were made to me to obtain this statement. I am 21 years of age and can read and write.

"Brenda Winters invited me into the house. I sat around for awhile on the couch. In thirty minutes, she was dead. What happened in the meantime wasn't much. It was just, it was here and there. *It wasn't nothing about sex or nothing like that. She thought I could come up anytime I wanted and be engaged with her in activities.* (Emphasis added). I said no reason. I always thought the feeling was mutual. She got a little red about it. A name was called. I said, "I don't have to take that." She got a little violent herself. The next thing I know, *I grabbed her, threw her on the floor. I was down on top of her, had my fingers completely touching each other around her throat, and then I just let off, got up, went in the kitchen and then I heard her making some noises.* (Emphasis added). I came back in there and I said, "I'm in more trouble now if I just leave her lay. If I kill her, something might happen." I didn't know what was going on. *I found a cord laying nearby and I strangled her. There was a knife in the kitchen. I took it. I didn't want to do it but I pressed it once and then drawed back and the next time I had it and then it just went in easy.* (Emphasis added). The blood came out and I said, "Oh, my God, what did I do" and then I finally realized what I done. The marks on her body was by my foot and that was it and then I left, disposed of the weapon going down Louisville Road. I just didn't think what it was over. I just lost it completely. I do need help. I know that. I do need help."

Danny testified that he and Gregg Marston [1] went to Brenda's house at her invitation. They listened to some music and smoked marijuana. At some point an argument between him and Gregg ensued. There was a struggle. Danny remembered grabbing Brenda. He had a knife and said, "Well, I don't want to do this." Nevertheless, he did murder Brenda. First, he "grabbed her by the throat and choked her until she turned blue, and passed out." He heard her making strange noises, gasping for air. Then he found a cord and strangled her. He then stabbed her. As his final act of cruelty, he kicked her in the head.

Immediately after the murder, Danny removed Brenda's slacks to make it appear she had been raped. Then he left the crime scene by a window to avoid detection. He was careful not to leave fingerprints. He hid in his automobile to avoid being seen by Carl Edwards. [2] Danny left curtains hang-

---

1. In his confession, Danny stated he was alone. Marston did not testify.

2. Edwards arrived at Brenda's around 7:00 A.M., July 24, 1976. He saw Danny's automobile parked perpendicular to the curb—He saw someone pull back the curtains. Because Brenda had company, he fell asleep in his car. When he awoke, Danny's automobile was gone.

ing outside a window. Later that day he requested a friend to drive him by Brenda's home to see if the curtains were still out. They were. He knew Brenda's body had not been discovered.

The evidence supporting Danny's testimony and his confession was overwhelming. Three witnesses observed his brown Toyota parked "catty-cornered" in front of Brenda's house at 7:00 A.M., July 24, 1976, in the range of the estimated time by the coroner and the pathologist as the time of Brenda's death.

Brenda's body was discovered by friends at 1:45 A.M., Sunday, July 25, 1976. There were stab wounds in the neck, signs of strangulation and fractures of the skull. This "tell-tale" evidence was consistent with Danny's confession and his testimony.

The coroner observed the stab wounds in Brenda's neck, as well as strangulation marks and the fractures of her skull.

The pathologist who performed an autopsy observed the stab wounds in the neck and chest. He saw parallel depression marks on the left side of the neck. These were consistent with strangulation. He was of the opinion that Brenda was strangled and then stabbed. The pathologist and the coroner were of the opinion the stab wounds were the cause of death. They estimated that Brenda's death occurred between 6:00 and 11:00 A.M., Saturday, July 24, 1976. That was within the time Danny's automobile was parked perpendicular to the curb in front of her house.

The above is a narrative of Brenda's gory murder. Additional details will be mentioned as they appear relevant to the questions presented.

Danny first assigns as error the trial court's failure to direct the jury to find him not guilty by reason of insanity. He argues that he had proved his insanity by a preponderance of the evidence. He contends that the burden of proving him sane then passed to the Commonwealth, which had failed to sustain that burden.

Some three weeks after Danny was lodged in jail, charged with Brenda's murder, he was given cursory psychological tests by Dr. Parks, a psychiatrist, and Dr. Pruitt, a psychologist. They both testified that at the time of the crime and at the time they examined him, Danny was unable to control his actions. They both were of the opinion Danny suffered from schizophrenia. There was also lay testimony that Danny was mentally ill.

Later, Danny was committed to the forensic unit of Central State Hospital. There, he was examined and given tests by Dr. Ravinni and Dr. Estanislao, both psychiatrists. They gave Danny a glucose tolerance test to see if he had brain damage. They found none. They gave him an electroencephalogram test to see if he had any neurological impairment. He did not. They observed Danny for four days. He was amiable; oriented as to time, place and person, and was in good contact with reality. He participated in ward activities, group and occupational therapy, and mixed well with other patients.

Dr. Ravinni [3] and Dr. Estanislao were of the opinion Danny was not suffering from "mental disease or defect" and was competent to stand trial. They reported that he was probably in possession of his mental faculties at the time he committed the crime.

■ With the evidence in this posture there was conflicting testimony as to Danny's sanity at the time he killed Brenda. Thus, it became a matter for the jury's determination. Recently, this court stated:

". . . the introduction of proof of insanity does not place a burden on the Commonwealth to prove him sane; rather, it entitles the defendant to an instruction to the jury that [it] may find him not guilty by reason of insanity . . . ." *Edwards v. Commonwealth,* Ky., 554 S.W.2d 380 (1977).

3. Dr. Ravinni did not testify. It was indicated he was unavailable as a witness. He did file a Forensic Report and recommendation.

The jury apparently considered Danny's conduct before and after Brenda's murder. It observed his demeanor at trial. It must have considered the fact that Danny was a juvenile counselor at the Kentucky Children's Home; that he worked 6 shifts per week, from midnight to 8:00 or 8:30 A.M. In addition to his duties as a counselor, he administered medications to the patients. Then too, the jury apparently considered Danny's cool, calm and deliberate actions in the perpetration of this heinous crime. In truth and in fact, the jury weighed Danny's fate in the balance and found it wanting. Its conclusion was consistent with the thoughts of a renowned writer who said: "Insanity is often the logic of an accurate mind overtaxed."[4] It did not accept Danny's plea of insanity.

This court does not accept Danny's argument that the Commonwealth had the burden of proving him sane. That burden never shifts. It was incumbent on him to prove his insanity. That was an insurmountable obstacle course that he failed to overcome. *Henderson v. Commonwealth,* Ky., 507 S.W.2d 454 (1974); *Edwards v. Commonwealth,* Ky., 554 S.W.2d 380 (1977). Therefore, this court is of the opinion that the trial court did not err in failing to direct the jury to find Danny not guilty by reason of insanity.

Danny's next argument is that his confession was involuntary and he was forced by the police to make it. He further contends that the confession was obtained in violation of the minister-penitent privilege under KRS 421.210(4).

Prior to trial, Danny's attorney moved the trial court to suppress the statements and confessions Danny made to the police. The trial court, on the basis of the evidence in support of and in response to the motion, overruled it. Subsequently, Danny, by counsel, requested the trial court to enter a nunc pro tunc order overruling the motion. The trial court did. Also, he made detailed findings of fact and conclusions of law in support of his action. The record in this court was supplemented by filing the order, findings of fact and conclusions of law, so that the matters could be reviewed on appeal.

This court has reviewed that evidence. A detail of relevant parts of the testimony as to Danny's conduct from the time of Brenda's murder, Saturday, July 24, 1976, between 6:00 and 11:00 A.M., until he made the confession at 7:15 P.M., Tuesday, July 27, 1976, is necessary to resolve the issues.

When Danny learned the police wanted to talk to him about the murder, he notified them he would be at State Police Headquarters in a short while if they would "call off" the officers who were looking for him. He didn't keep that promise.

Meanwhile, two detectives of the Franklin Police Department who were driving by the business place of Danny's father saw Danny get into his parked automobile. As they approached him, he drove away at a high rate of speed. After a chase in which three other vehicles were damaged he was apprehended.

Danny was advised of his constitutional rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He was taken to State Police Headquarters, where he was again given his *Miranda* warnings.

He then was placed under arrest on an outstanding warrant from Anderson County, Ky., on a charge of disorderly conduct. He was questioned briefly concerning Brenda's murder and denied any knowledge of it. From there he was taken to Frankfort Police Headquarters to await the arrival of Anderson County authorities, to transfer him to Lawrenceburg, the county seat.

On Monday, July 26, 1976, Danny's parents went to Lawrenceburg. They effected his release by posting bond. He returned to Frankfort. That afternoon he stopped at Frankfort Police Headquarters and picked up an extra set of keys to his automobile. At that time, Danny voluntarily discussed Brenda's murder with a state police detective. He was not in custody. However, he

4.  O. W. Holmes, *The Autocrat of the Breakfast Table,* Ch. 2 (1858).

agreed to take a polygraph test the next day at 1:00 P.M. When he returned to his automobile, he confided in some friends that he was not going to bed until he had taken the polygraph test. In that manner, he assumed he could beat the test.

That night, Danny worked the midnight to 8:00 A.M. shift as a juvenile counselor at the Kentucky Children's Home in Lyndon, Ky., some 48 to 50 miles from Frankfort.

He returned to his parents' home in South Frankfort on the morning of July 27, 1976. He did not go to bed, but called a girl friend to come visit him. She stayed until Danny left to take the test. At that time she saw him take a capsule of ten milligrams of valium. He placed another capsule of ten milligrams of valium in one nostril.

Danny drove to State Police Headquarters. The polygraph examiner suggested that he not take the test until he had a blood and urine analysis to determine if he was under the influence of drugs. With Danny's consent, he was taken to Doctors Place, South Frankfort, where the tests were administered. He then went with the detectives to Frankfort Police Headquarters for questioning.

He was again advised of his rights under *Miranda* at 2:35 P.M., Sunday, July 27, 1976. Danny then signed a statement in which he waived his *Miranda* rights. He was asked if he would make a written statement regarding comments he had made the previous day. He agreed, and a stenographer was called to take the statement. He was free to roam the police headquarters while the statement was being typed. He drank a "coke," conversed with those present, and read a magazine. On being asked if he desired anything to eat, he said he did not. He read the statement,[5] initialed each page and signed it at 4:40 P.M., July 27, 1976.

At no time during his stay at the Frankfort Police Department on the afternoon of July 27, 1976, did he request, nor was he denied, the services of an attorney. He was told each time the *Miranda* warnings were given that he was entitled to the services of a lawyer. Prior to his confession, he was not charged with Brenda's murder.

After signing the false statement at 4:40 P.M. he was again interrogated briefly. When he was confronted with Carl Edwards' statement placing his Toyota in front of Brenda's house at the time the crime was estimated to have occurred, and viewing photographs of the crime, Danny had a troubled conscience. His burden of guilt was heavy. He requested to see his friend, Reverend Larry Weiss, whom he had met some weeks earlier. Reverend Weiss visited Danny at approximately 6:00 P.M. After conferring with Reverend Weiss, Danny agreed to make a second statement. However, he requested to see his parents, girl friend, former wife and other family members after making a statement as to what actually happened. The police complied with that request. It is evident that after Reverend Weiss conferred with Danny for thirty or forty-five minutes, he wanted the Reverend Weiss to tell the police that he (Danny) had murdered Brenda. The Reverend told Danny that he would have to tell them.

■ There is not a shred of evidence that undue pressure by the police was exerted to obtain the confession. The facts do not establish that the confessions were obtained in violation of the minister-penitent privilege. Reverend Weiss was at the jail because of Danny's request. He was certainly not in control or direction of any police officer. At Danny's request, Reverend Weiss returned to the jail around midnight. Then Danny told him where he had hidden the butcher knife. He authorized the Reverend Weiss to accompany the police detectives, who found the knife where Danny told them he hid it. The Reverend Weiss testified that before Danny confessed, he "[R]elated some facts which he, in turn, asked me to relate to the detectives outside." In order to invoke the minister-

---

**5.** Danny admitted seeing Brenda, but denied being at her house at any time on July 24, 1976.

He said he arrived at his home at 4:30 A.M. and went to bed. He slept until 10:00 to 10:30 A.M.

penitent privilege as provided in KRS 421.-210(4) the statement must be made to the minister in his *professional capacity.* Here, Danny spoke to Reverend Weiss as a friend rather than as a minister. Thus, no privilege was attached to the statements Danny made.

This court is of the opinion that the trial court's ruling that the confession was admissible and there was no violation of the minister-penitent privilege is amply supported by the evidence. It is noted also that the trial court's instructions to the jury included an instruction as to the voluntariness of Danny's confession.

■ Danny contends that he suffered from prosecutorial vindictiveness because he refused to plead guilty and take a 20-year sentence. It is true that at a pre-trial hearing involving plea bargaining, the Commonwealth's Attorney made that offer which Danny rejected. He contends that because he chose to risk his fate at the hands of the jury, the Commonwealth's Attorney was precluded from asking the jury to fix his punishment at life imprisonment. That is an erroneous assumption. No mention of the offer was made in the closing argument. Hence, no prosecutorial vindictiveness was shown. Furthermore, the Supreme Court of the United States has recognized plea bargaining to be not only constitutional, but also an essential ingredient to the effective administration of criminal justice. See *Bordenkircher, Penitentiary Superintendent v. Hayes,* —— U.S. ——, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978).

A thorough review of the record of Danny's trial reveals no prejudicial error. He received a fair and impartial trial. In the trial arena both Danny's attorney and the Commonwealth's Attorney made excellent presentations of their respective theories of the case. They were well prepared. The trial court was patient, tolerant and demonstrated a thorough knowledge of the law of the case. In his instructions, the trial court touched all bases. He instructed the jury on murder, first degree manslaughter, insanity, voluntariness of the confession, the effect of being found guilty by reason of insanity, and reasonable doubt. Who could have asked for more?

This court has carefully reviewed each of the other assignments of error and find them to be without merit. On the totality of all the proceedings it is this court's considered judgment that Daniel Lee Wainscott received more than a "tolerably fair trial." [6]

The judgment is affirmed.

All concur.

---

6. *Shawhan v. Commonwealth,* Ky., 318 S.W.2d 541 (1958).