Parramore Lee SANBORN, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 91–SC–501–MR.

Supreme Court of Kentucky.

Oct. 27, 1994.

As Modified on Denial of Rehearing
March 23, 1995.

Barbara M. Holthaus, Rebecca Ballard DiLoreto, Asst. Public Advocates, Dept. of Public Advocacy, Frankfort, for appellant.

Chris Gorman, Atty. Gen., Kent T. Young, Asst. Atty. Gen., Ian G. Sonego, Asst. Atty. Gen., Criminal Appellate Div., Frankfort, for appellee.

SPAIN, Justice.

This is an automatic appeal of a death sentence imposed upon the appellant, Parramore Lee Sanborn, on May 14, 1991, by the Jefferson Circuit Court following his conviction by a jury on a retrial for the intentional murder of Mrs. Barbara Heilman. He was also found guilty of the first-degree kidnapping, first-degree rape, and first-degree sodomy of the victim for each of which his punishment was set at imprisonment for ninety-five years, all to run consecutively for a total of 285 years.

During the first trial, which was held in the Henry Circuit Court and extended from January to March of 1984, the appellant was convicted of the same crimes and was sentenced to death for the murder and to life imprisonment for each of the other three felonies. On appeal, this Court on June 9,

1988, reversed the judgments and sentences for prosecutorial misconduct and for errors committed regarding the admissibility of evidence. *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534 (1988).

In early 1989, the original trial judge recused himself and granted a change of venue. The case was moved to Jefferson County, was prosecuted by the Commonwealth's Attorney of that county, and was presided over by Special Judge William L. Shadoan of the First Judicial Circuit, Kentucky's westernmost circuit.

The crimes were committed on the night of October 12, 1983, or during the early morning hours of the following day. The victim, Mrs. Heilman, lived on a Henry County farm with her husband, her two daughters, and her eleven-year-old son. That evening, Mr. Heilman was in a Louisville hospital awaiting surgery, where their younger daughter was also a patient because of illness. Since the older daughter was also away at college, only Mrs. Heilman and her son were at home.

Sometime after the boy went to bed, thirty-eight-year-old Parramore Lee Sanborn, according to his own later incriminating statement, drove his car into the Heilman driveway. He had previously worked on the Heilman farm and had said several days earlier that he didn't like the Heilmans and "would get his revenge."

Mrs. Heilman answered Sanborn's knock at her door whereupon he told her his car wouldn't start and he needed a ride. He said they got in the car and drove down to the road at the end of the Heilman driveway. Her car was at that place the following morning when it was discovered by the Heilman boy, who had awakened and found his mother missing and called for help.

When police officers arrived, they found evidence of a vicious attack in and around the car in the driveway. A large pool of blood was found a few feet from the car and the victim's eyeglasses and hair curlers, still wrapped with her hair, were found scattered on the ground and driveway and inside her car. Pieces of bloody flesh were found in her car, which still had her keys in the ignition switch, and an umbrella was jammed inside the driver's door, preventing its being forced open.

The Sheriff and other police officers proceeded to canvass the neighborhood, including the house where the appellant rented a room. He was there and invited the officers in. They noted blood under his cuticles and smeared on his pants leg. His shoes were sitting near the door and were bloodstained. He had a fresh scratch on his face, and there was a large quantity of blood on the floor and passenger seat of his car as well as on the steering wheel.

Based on all this evidence, Sanborn was arrested and made various incriminating statements. He agreed to help the police find Mrs. Heilman's body, but a search party located it before his arrival with police at the scene. The body was located a few miles from the Heilman farm, was partially nude, and bore multiple stab wounds. Mrs. Heilman's hands contained numerous knife wounds such as would have been sustained if she were attempting to defend herself.

Much forensic evidence connected Sanborn to the crimes, such as the fact that Mrs. Heilman's blood matched that found on the steering wheel of Sanborn's car, and hairs matching Sanborn's were found on her body. Scrapings from Mrs. Heilman's fingernails matched carpet fibers from Sanborn's car. Her body bore physical evidence that she had been forced to perform oral sodomy, and expert testimony tied Sanborn to these acts.

Finally, at the second trial now under review, defense counsel in opening statement conceded that Sanborn had killed Barbara Heilman and performed sex acts upon her, although counsel contended that the appellant acted under an extreme emotional disturbance and that the sex acts occurred after Mrs. Heilman was dead.

Some thirty assignments of error were set out in the appellant's brief, of which eight to ten were emphasized at oral argument. Although we have considered each claim carefully, we found none to amount to prejudicial error so as to require reversal of the convictions or sentences. This opinion will address only those which presented relatively serious questions or caused real concern.

## I. DID DEFENSE COUNSEL'S MIS-CONDUCT PREJUDICE APPEL-LANT'S RIGHT TO A FAIR TRIAL?

The first error claimed to have prejudiced the appellant's right to a fair trial resulted from a bizarre occurrence, to wit: the misconduct of his assistant defense counsel in wrongfully taking from the Commonwealth's counsel table the notes of a prosecutor concerning the voir dire of the jury panel.

The prosecutor brought to the Court's attention the fact that his notes of the voir dire of the jury were missing from his counsel table on the afternoon of March 25, 1991. The Court asked all trial participants whether anyone knew what happened to the notes, and no one responded. On the following morning, as the prosecutors were preparing to view videotapes of the previous afternoon's courtroom activities, counsel approached the bench outside the presence of the jury panel and the defendant, at which time the assistant defense counsel admitted that she took the prosecutor's notes off the Commonwealth's counsel table the previous day. She admitted that she was just "being nosy" and characterized her conduct as "inexcusable." The trial judge agreed and asked whether the Commonwealth wished to make any motions regarding the matter. The Commonwealth's Attorney responded that he was in a "Catch 22" situation but didn't want to do anything to cause the case to be continued, so he would make no motions. The Court asked lead defense counsel if he had any recommendations, but he replied in the negative. The Court concluded by commenting that he would later see what he would do about the matter. The jury selection process continued.

Some nine or ten days later, after the prosecution had concluded its case in the guilt phase and during the defense's presentation, the same assistant defense counsel appeared before the bench outside the presence of the jury and complained about a news account of her having taken the prosecutor's notes. She expressed concern that the jury might have been contaminated and also claimed that this development had created a conflict of interest on the part of defense counsel. She moved for a mistrial, which was denied. The trial judge reminded counsel that the jurors had been admonished not to watch TV or read newspaper accounts of the trial. He offered to question the jurors as to whether they had done so. The Commonwealth's Attorney commented that he had not brought the incident to the attention of the news media and told his assistant not to do so.

Counsel for the defense then asked the trial judge to recuse himself, which he declined to do. She then moved that she and lead defense counsel be permitted to withdraw from the case, citing a "conflict of interest," and suggested that her attention had been distracted from the defense of her client because of the threat of further action being taken against her. The Court denied these motions and reiterated that he would delay any appropriate action until a later time. The offending assistant defense counsel moved to question the jurors as to their knowledge of the incident, and the Commonwealth and the court acceded to her request. The trial judge then questioned each of the fifteen jurors individually about any knowledge of a media report. Each responded that he or she had not seen or read any news accounts about the case.

The appellant insists that defense counsel's misconduct kept her from being an "aggressive" and "loyal" advocate because "... the specter of pending, unnamed sanctions loomed over the defense team." It is further stated that "[t]hose threats divided counsels' loyalties between their own interests and appellant's—creating an actual, unwaivable conflict that required their removal from the case."

■ The appellant's brief describes his counsel's situation as a "conflict per se" and opines that the responsibility of both defense counsel "to vigorously defend" him was chilled by the conflict. It is claimed that offending counsel was "forced" to choose between her interests and her client's, and that counsel had to avoid "antagonizing the court any further." We find the attitude reflected or implied in the choice of these words to be very disturbing. We do not think the responsibility of counsel to "vigorously defend" a client is ever compromised by the profes-

sional, ethical conduct of a lawyer in relationships with the court. Furthermore, all ethical lawyers should at all times conduct themselves so as to avoid "antagonizing the court." The appellant has no right to expect his trial counsel to do otherwise. We fail to understand how there was any actual conflict here between the best interests of counsel and those of the appellant. More importantly, the appellant seems to argue that prejudice to him must be presumed by the Court since he insists there was a per se conflict. We decline to indulge in any such presumption of prejudice. The U.S. Supreme Court in *Burger v. Kemp*, 483 U.S. 776, 783, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638 (1987), stated as follows:

> We have never held that the possibility of prejudice that "inheres in almost every instance of multiple representation" justifies the adoption of an inflexible rule that would presume prejudice in all such cases. See *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). Instead, we presume prejudice "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland [v. Washington]*, 466 U.S. [668], at 692, 104 S.Ct. [2052], at 2067 [80 L.Ed.2d 674] (citation omitted). See also *Cuyler*, 446 U.S., at 348, 350, 100 S.Ct., at 1719.

After searching the record, the *Burger* Court concluded that counsel in that case had not actively represented conflicting interests nor was there proof that an actual conflict of interest had adversely affected counsel's performance in representing his client. The Court applied the *Strickland* test and commented:

> Petitioner has not established that 'in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance.' *Strickland, Id.,* at 690, 104 S.Ct., at 2066. He 'has made no showing that the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in

counsel's assistance.' *Id.,* at 700, 104 S.Ct., at 2071.

483 U.S. at 795–96, 107 S.Ct. at 3126.

The United States Court of Appeals for the Fifth Circuit recently considered the question of whether there was an actual conflict of interest on the part of an attorney requiring withdrawal from representation of a defendant in a murder prosecution. In *Beets v. Collins*, 986 F.2d 1478 (1993), the petitioner Beets was convicted of the murder of her husband in Texas and was sentenced to death. Her appeals to the Texas Court of Criminal Appeals and for a writ of certiorari to the U.S. Supreme Court were unsuccessful, as was her petition for habeas corpus in the state court. A U.S. District Court granted the writ, however, after finding that Beets' defense counsel at trial was a material witness who should have resigned and withdrawn from representation so as to testify in favor of Beets. Such testimony would have been in rebuttal of the prosecution's claim that she had killed her husband to receive insurance benefits, because defense counsel had in fact initially brought the matter of such insurance proceeds to the attention of Beets during a conversation.

The Circuit Court reversed, finding that another witness had testified to the same effect and that there was no actual conflict of interest nor that any potential conflict actually adversely affected counsel's performance or Beets' defense. The Opinion stated in part, 986 F.2d at 1486:

> Even assuming Beets's factual allegations, she has failed to establish the 'constitutional predicate' for her claim of ineffective assistance of counsel due to a conflicting interest. Under Cuyler, Beets has not established a violation of the Sixth Amendment until she demonstrates that her counsel 'actively represented conflicting interests.' This requirement that a defendant show counsel's active representation of conflicting interests stems from the concern that potential conflicts of interest will be dressed up as Sixth Amendment violations. In Cuyler, the Court recognized the constitutionalized concern that counsel not serve 'two masters' is simply not implicated when a potential conflict of interest fails

to develop into an actual conflict of interest. A theoretical or merely speculative conflict of interest will not invoke the protections of the Sixth Amendment. Indeed, as a threshold matter, the defendant must demonstrate that the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests.

Beets's allegations set forth facts, which, if proven, indicate a potential conflict of interest. But that is as far as her allegations go. She never takes the critical step to allege and provide proof that the potential conflict of interest developed into an actual conflict of interest....

... Because Beets has not demonstrated that [attorney] Andrews was forced to make a choice between her interests and his own, her claim that Andrews 'actively represented conflicting interests' must fail. [Citations omitted.]

■ Here, as in *Beets*, there was no showing that the assistant defense counsel at any time was forced to make any kind of choice between her interests and those of Sanborn. Furthermore, the appellant has certainly not shown that "in light of all the circumstances, [any] acts or omissions [of either defense counsel] were outside the wide range of professionally competent assistance." *Strickland, Id.* 466 U.S. at 690, 104 S.Ct. at 2066. Sanborn "has made no showing that the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance." *Id.,* at 700, 104 S.Ct. at 2071.

■ As a collateral argument, the appellant insists that it was error for the trial court not to hold a hearing on this entire matter of whether counsel had a conflict of interest, with appellant being present in person. Further, it is argued that the conflict on the part of the offending attorney also amounted to a vicarious conflict on the part of lead defense counsel. We disagree. There was no necessity for the appellant to be present during the court's inquiry of counsel as to their knowledge of the prosecution's missing notes. No testimony was taken and there was accordingly no need for cross-examination. This was purely a matter be-

tween the trial judge and counsel. Moreover, when the court questioned the jurors as to whether they had heard or read any news reports concerning the trial, the appellant was present. We see no merit to the claim that the lead defense counsel was somehow vicariously burdened with an alleged conflict of interest even if we found such a conflict on the part of assistant defense counsel. There was no attempt to show any knowledge on his part of the actions of assistant defense counsel in taking the prosecution's notes. Consequently, lead defense counsel could not have had any impairment whatever in his representation of the appellant by reason of his colleague's misconduct. The Commonwealth has also pointed out that this Court, in *Summit v. Mudd,* Ky., 679 S.W.2d 225 (1984), *modified, Whitaker v. Commonwealth,* 1995 WL 63633 (Ky. February 16, 1995), rejected the vicarious disqualification rule for Kentucky prosecutors and that the same rationale should apply to public advocates, since neither government prosecutors nor government defenders have any personal stake in whether an office colleague or co-employee is successful in representing a client, unlike attorney-partners in private law firms.

## II. DID THE TRIAL COURT ERR WHEN IT PERMITTED REVEREND BARCLAY BROWN TO TESTIFY AT THE RETRIAL?

The appellant argues that it was error for the trial court to allow the Commonwealth to call Rev. Brown to the stand. Rev. Brown testified on the second trial that the appellant admitted to him that Ms. Heilman was alive and screaming when he raped her. This testimony was central to the appellant's conviction for rape, since the defense insisted that Mrs. Heilman was already dead when Sanborn sexually abused her body. On appeal, appellant argues that Rev. Brown should not have been allowed to testify at retrial because he was involved with the defense team in the first trial. It is argued that Brown's testimony should not have been permitted due to either an attorney-client or a priest-penitent privilege flowing from his

connection to the first trial. We fail to find either privilege.

■ For information to be shielded from discovery by the attorney-client privilege, it must have been made in confidence to a lawyer for the purpose of obtaining legal advice. *Federal Trade Commission v. TRW., Inc.,* 628 F.2d 207 at 212 (D.C.Cir. 1980), and *von Bulow by Auersperg v. von Bulow,* 811 F.2d 136, 146 (2nd Cir.1987). Although Rev. Brown may have been considered a representative of a lawyer, the statements made to him are not privileged because they were not made with the clear understanding that they were confidential. Among other things, confidentiality implies that the information will not be used to form the basis of expert testimony at trial; this is because expert testimony must be cross-examinable. KRE 705, and *Foster v. Commonwealth,* Ky., 827 S.W.2d 670 at 678–679 (1992). As is stated in Weinstein's and Berger's treatise on evidence:

> 1. A distinction must be drawn between an expert hired to testify at trial and an expert consulted as an adviser who will not testify. The first is a witness who, as the Advisory Committee's Notes to Standard 503(a)(3) indicate, does not fall in the definition of representative of lawyer. In this situation disclosure is contemplated and the privilege is eliminated. A contrary finding would permit a party to exclude relevant evidence. A party ought not to be permitted to thwart effective cross-examination of a material witness whom he will call at trial merely by invoking the attorney-client privilege to prohibit pretrial discovery. [Footnotes and internal quotation marks omitted.]

Weinstein and Berger, 2 *Weinstein's Evidence* (1982), Paragraph 503(a)(3)[01] subparagraph 3, p. 503–36.

Bette Niemi, defense counsel at the first trial, testified that at the time Rev. Brown talked to appellant she believed she might have Brown testify offering a theological perspective on the death penalty. He agreed to do so if called. At a later date, Niemi decided not to call Rev. Brown and at that time told him his services would no longer be required. It is clear from the record on this appeal that at the first trial it was not made clear that Rev. Brown was only meant to be a consultant for the appellant's defense. It was in fact contemplated that he would be an expert witness called to discuss the death penalty and any remorse shown by the appellant. Because such was the case, the appellant cannot now invoke an attorney-client privilege to disallow Rev. Brown's testimony.

■ The appellant also contends that the testimony in question should be considered confidential and thus disallowed under the priest-penitent privilege. The testimony in question is not privileged on this ground either. For a communication to be covered under this privilege it must be communicated to a member of the clergy when that person is acting as a spiritual advisor and the information is not meant to be transferred to anyone else. KRE 505(b). This Court has already recognized that communications to a member of the clergy will not be privileged if they are to be relayed to a third party not covered by the privilege. *Wainscott v. Commonwealth,* Ky., 562 S.W.2d 628 at 632–633 (1978). In this situation it is clear that Rev. Brown came in contact with the appellant in contemplation of testifying at trial; such a fact alone mitigates against a situation invoking the priest-penitent privilege. Additionally, there is no testimony at all that the appellant used his contacts with the minister to obtain spiritual advice or to discuss his spiritual well-being. Incidentally, Rev. Brown testified that his involvement with the appellant was for the purpose of preparation by him of a case study in connection with a seminary class which he was then taking at Asbury College. He further stated that he used his notes to prepare a paper, which he had submitted before the second trial. Rev. Brown further testified that he was not employed by the Department of Public Advocacy or by defense counsel and was never offered any compensation whatsoever. When asked whether he was told that all his conversations with the appellant and defense counsel were confidential, he responded, "Not that I can remember." Due to these facts there was no violation of the priest-penitent privilege in allowing Rev. Brown to testify.

### III. WAS IT ERROR TO REFUSE TO PERMIT APPELLANT'S EXPERT TESTIMONY ON MENTAL HEALTH DEFENSE AT GUILT PHASE?

The appellant argues that he was denied due process of law when the trial court refused to admit evidence of his mental state through a psychologist, Dr. Phillip Johnson. He claims that his defense at trial was based upon Dr. Johnson's testimony concerning Extreme Emotional Disturbance (EED). Sanborn filed notice of his intent to rely upon EED at trial and provided copies of Dr. Johnson's reports to the prosecution. Upon receipt of these reports, the Commonwealth took measures to recruit Dr. Victoria Skelton of KCPC to rebut the expert testimony of Dr. Johnson. At trial, however, the prosecution, citing *Stanford v. Commonwealth*, Ky., 793 S.W.2d 112 (1990), objected to Dr. Johnson as a witness, claiming the expert testimony was inadmissible because no proper foundation was laid for the testimony. Furthermore, the prosecution objected because the testimony was a hearsay recitation of what the appellant told the doctor during interviews, especially since the appellant did not testify at trial subject to cross-examination. The trial court sustained the objection, and Dr. Johnson was not allowed to testify during the guilt phase.

The appellant contends that the prosecution's objection was waived because it was not timely filed. *Williams v. Commonwealth*, Ky., 602 S.W.2d 148, 149 (1980). He further contends that a proper foundation existed for Dr. Johnson's testimony to be admitted and that the statements made by him to Dr. Johnson were not hearsay.

The appellant attempted to introduce Dr. Johnson to testify about the "triggering event" of the EED that caused him to act in the manner that he did. He now argues that the trial court erred in excluding this testimony because sufficient independent evidence of the surrounding circumstances existed upon which Dr. Johnson could base his expert opinion that appellant was influenced by EED. However, the trial court excluded the testimony because the defense counsel conceded that the expert's information regarding the triggering event and his reaction thereto were based only on what the defendant/appellant had told him. The trial court ruled that Dr. Johnson would be allowed to testify but that he could not testify as to a triggering event related by the appellant to him but unsupported by the slightest of independent evidence.

The independent evidence alluded to by the appellant as providing a foundation for the expert testimony on EED does not tend to establish the existence of either a "triggering event" or intoxication to the extent that the appellant did not know what he was doing. The only evidence which existed to support the appellant's claim of a "triggering event" were his own uncorroborated statements to Dr. Johnson that the victim refused his romantic advances and mocked his stuttering.

The appellant, during the investigation before trial, told several different versions of the events that took place on the night of the murder. Furthermore, Dr. Johnson testified that testimony by other witnesses regarding events which happened prior to the murder could be indicative of mental illness or an antisocial personality as well as EED. Dr. Johnson also testified that he did not believe the events as told to him by Parramore Sanborn. Therefore, what was claimed to be the "triggering event" may never have occurred. There is no independent evidence of the existence of this "triggering event," but only the self-serving, hearsay statements made by Sanborn to his psychologist, Dr. Johnson. For these reasons, the trial court was justified in refusing to allow Dr. Johnson to testify as to what the appellant told him was the "triggering event."

The appellant's brief also makes mention of the fact that an expert may base his opinion on hearsay evidence if it is of a type "reasonably relied upon by others in the field." Lawson, *The Kentucky Evidence Law Handbook*, 3rd edition, § 6.15, 297–298. However, it cannot be said here that the trial court abused its discretion in disallowing the expert to testify as to what the appellant had told him, especially considering the expert's statement that he doubted that the appellant was telling him the truth.

## IV. WAS IT PREJUDICIAL ERROR TO ALLOW THE COMMONWEALTH TO CALL AN INMATE INFORMANT ON SHORT NOTICE?

· The Commonwealth introduced James Tingle as its next-to-last witness in its case against Parramore Sanborn. Tingle testified that he was incarcerated with Sanborn sometime during December of 1983. The gist of his testimony regarded a threat made by Sanborn to a third inmate in which Sanborn admitted "killing" someone. Tingle testified that Sanborn said, "I have killed once but they cannot kill me but once." When Tingle was called as a witness at trial, defense counsel complained that he was given insufficient notice of the Commonwealth's intention to call Tingle as a witness and consequently he was not prepared to effectively cross-examine him. Thereafter, the trial court allowed defense counsel to question Tingle extensively, outside the jury's presence, about possible bias against Sanborn and also about the witness's own criminal record. Subsequently, Tingle was allowed to testify by the trial court. However, the record does not show that the defense counsel sought any additional recess or delay in which to investigate the witness or his testimony more thoroughly.

■ The appellant now contends that he was substantially prejudiced and his rights to due process were violated in both the guilt phase and sentencing phase when this witness was allowed to testify. The crux of his argument is that the lack of notice given by the Commonwealth of its intention to call James Tingle was violative of the discovery process and prevented defense counsel from possibly discovering some exculpatory evidence, and thus Tingle's testimony should not have been admitted. The appellant broadly claims that he was prejudiced by the trial court's action, but does not point to or offer any hint of what he might have discov-·· ered to exculpate himself. Part of the delay in notice was due to the fact that, as of March 25, 1991, Tingle's statement was incomplete and the final police report was not typed until April 1, 1991. Additionally, investigators had a difficult time locating Tingle and were unsure of how valuable he would be to their case. Once the Commonwealth's Attorney was sure he would call Tingle, the defense counsel was given an opportunity to question him outside the presence of the jury.

■ The appellant argues that the admission of this testimony was so prejudicial as to require reversal of the judgment of the trial court. In support of this argument the appellant points to *Ballard v. Commonwealth,* Ky., 743 S.W.2d 21, 22 (1988). He acknowledges that the evidence withheld in that case was exculpatory in nature, but that the rule requiring reversal should be extended to the evidence in this case so as to insure due process. However, this Court has held that it is within the trial court's discretion as to whether to allow evidence of this nature to be ¨introduced. *Berry v. Commonwealth,* Ky., 782 S.W.2d 625, 627–28 (1990); *Carter v. Commonwealth,* Ky., 782 S.W.2d 597, 601 (1990). Under the circumstances of this case, it cannot be said that the trial court abused its discretion. For this reason, along with the fact that the appellant merely speculates that he could possibly have uncovered some exculpatory evidence if given earlier notification of the Commonwealth's witness, the decision of the trial court should not be reversed. At the most, the trial court's action was harmless error.

■ ¨The appellant also contends that this testimony concerning evidence of other crimes was unduly prejudicial. Once again, the appellant has failed to show that the trial court has abused its discretion in determining that the probative value of the testimony outweighed any possible prejudice. *Dunbar v. Commonwealth,* Ky., 809 S.W.2d 852–855 (1991). Since the appellant was often inclined to change his version of the facts, Tingle's testimony was relevant to show that in December of 1993 Sanborn admitted having killed someone prior to his incarceration. Once again, this does not require a reversal of the trial court.

## V. WAS THE APPELLANT PREJUDICED DURING THE PENALTY PHASE WHEN THE COMMONWEALTH'S EXPERT TESTIFIED THAT HE HAD CHANGED HIS STORY TO FIT THE DEFENSE OF EED?

Dr. Victoria Skelton testified during the penalty phase that she had conducted two separate interviews, one on March 8, 1991, and the other on March 11, with the appellant in order to evaluate his mental condition for purposes of rebutting Dr. Johnson's expert testimony. She testified that at the first meeting with Sanborn that he denied any involvement in the murder of Barbara Heilman. She then testified further that during her second interview with Sanborn he admitted killing the victim, but described a situation which caused him to act under extreme emotional disturbance (EED). The Commonwealth then attempted to ask Dr. Skelton why, in her opinion, the appellant had changed his version of the facts so drastically. At this time, the defense counsel objected because it felt that the line of questioning violated Sanborn's right to attorney/client privilege, his right against self-incrimination, and that it implied that the defense counsel had encouraged him to "lie" or change his story. The trial judge then allowed Dr. Skelton to testify as to why she thought the story had changed, but limited the testimony so no reference to the defense counsel visiting Sanborn would be made and so the jury would not infer that defense counsel encouraged Sanborn to change his story.

 The appellant now contends that this ruling violated his rights to counsel, his right against self-incrimination, and that this testimony was irrelevant and highly prejudicial. Appellant cites *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), in support of his position that Dr. Skelton's testimony should have been excluded because her examination went beyond the scope of the discovery order and that the information was self-incriminating and was obtained without defense counsel's knowledge. The appel-

lant in *Estelle* asserted that his rights were violated when a psychiatrist questioned him about matters not contained in the discovery order. In that case the defendant had not introduced any psychiatric evidence, but submitted to the evaluation for the sole purpose of determining his competence to stand trial. The U.S. Supreme Court agreed with the Court of Appeals and the appellant that his Constitutional guarantees were violated by the examination and vacated his sentence of death. However, Sanborn's case is more similar to the exception to the *Estelle* holding which is stated on page 472, 101 S.Ct. page 1878 of that opinion. The exception being that where a defendant introduces psychiatric evidence into the record, as Sanborn did, he must also submit to examination by the prosecution's expert for rebuttal purposes. In these instances the scope and admissibility of the expert's findings are not as limited as they were in *Estelle*. If the statements are necessary for the expert to formulate and explain her opinion, then the statements are admissible and are not violative of the defendant's rights.

 The record shows that the trial court went to great lengths to prevent the jury from hearing that the defense counsel visited the appellant in the time between his two interviews with Dr. Skelton. Also, it was not improper for Dr. Skelton to inquire of the appellant as to why he changed his version of facts between interviews. This information was helpful to Dr. Skelton in her evaluation of the appellant. Furthermore, the explanation was necessary for Dr. Skelton to explain the inconsistencies in the stories told to her by Sanborn. Granted, it would have been improper for Dr. Skelton to question Sanborn about his defense strategy per se, but at most it was harmless error. The testimony complained of was given during the penalty phase at which time guilt had already been determined. It is not improper for a jury to be informed of a change in a story by a defendant so that they may consider the motivation behind the change while determining the appropriate punishment for a crime.

## VI. WAS THE APPELLANT DENIED DUE PROCESS BY THE TESTIMONY OF THE PROSECUTION'S EXPERT REGARDING HER DISAGREEMENT WITH THE APPELLANT'S MENTAL HEALTH EXPERT?

The appellant claims that he was denied due process in the sentencing phase of his trial because the Commonwealth was allowed to present a mental health expert "to denigrate his mitigation evidence"; namely, the existence of Extreme Emotional Disturbance (EED). Sanborn argues that this expert, Dr. Victoria Skelton, attacked the credibility and validity of his expert's testimony (Dr. Phillip Johnson), mischaracterized the nature of his expert's testimony, and suggested to the jury that such mitigating evidence should be considered as aggravating evidence.

Sanborn argues that Dr. Skelton offered an improper opinion on the ultimate issue of appellant's specific mental state at the time of the crime. He claims that it was error for Dr. Skelton to testify that, based on her evaluations of the appellant, his actions (crimes) were "contemplated," from which the prosecutor elicited that Dr. Skelton believed the acts were equivalent to being premeditated. Counsel for the appellant argues that this testimony is in direct violation of *Rose v. Commonwealth*, Ky., 725 S.W.2d 588 (1987). In *Rose*, this Court distinguished testimony about the accused's mental condition from that about the accused's mental state at the time the crime was committed. *Id.* at 591. The appellant further claims that Skelton's testimony goes more to the ultimate issue than did the testimony of Dr. Johnson. Dr. Johnson testified, based on the appellant's story, that the appellant was in a state of rage on the night of the murder, and appellant argues that this testimony was relevant to the appellant's mental state, but that this does not go to the ultimate fact in issue.

It should be noted that Dr. Skelton merely expressed her opinion, based upon her evaluations and information which she had about the appellant, that his actions were contemplated. A jury is not bound by the testimony of an expert and may choose to disbelieve the expert's opinion. In this case, the jury could have found the testimony of Dr. Johnson, that the appellant acted in a state of rage, to be a more accurate characterization of his mental status at the time the murder occurred.

The appellant also argues that the Commonwealth's expert unfairly denigrated the testimony of his mental health expert by insinuating that Dr. Johnson, a psychologist, was in an inferior position and was less qualified than Dr. Skelton, a psychiatrist. He further argues that the Commonwealth undermined the effectiveness of his expert testimony by questioning his methods through the testimony of Dr. Skelton.

The appellant broadly overstates the law concerning Kentucky's recognition of the difference between the abilities of a psychiatrist and a psychologist to provide expert testimony. Pointing to *Rose v. Commonwealth, id.* at page 591, the appellant claims that there is no difference between the two. *Rose* simply does not stand for this principle. It states:

> This was a registered nurse rather than a psychiatrist *or* clinical psychologist trained to diagnose mental conditions in specific individuals.

The appellant further argues that the Commonwealth should not have been allowed to attack the expert testimony of Dr. Johnson. He claims it is the role of the jury to determine the credibility of a witness and not the role of another witness to do this. However, the credibility of expert testimony is subject to *attack and* cross-examination by the opponent of such testimony. *Edwards v. Commonwealth*, Ky., 554 S.W.2d 380, 385 (1977). In this instance, the Commonwealth on direct examination asked Dr. Skelton how she determined her opinion that the appellant's acts were premeditated. She responded to the effect that she based her opinion on the reports and records on the appellant instead of basing her opinion on what the appellant told her. She claimed she used this practice because antisocial personalities tend to be untruthful. This method was shown to be in contrast to that employed by Dr. Johnson, who based his opinion upon his interviewing of the appellant. Dr. Johnson testified that he was unsure of the truthful-

ness of the statements, but opined that appellant was likely in a rage on the night he killed Mrs. Heilman. This testimony of Dr. Skelton was not elicited so as to denigrate that of Dr. Johnson, but rather, so as to contrast it with his in order for the jury to best determine which explanation of the defendant's mental state was more accurate and to account for the differences in opinion.

### VII. WAS THE APPELLANT'S SENTENCING UNFAIR BY REASON OF THE PROSECUTOR'S COMMENTS ABOUT THE ROLE OF MITIGATION AND BECAUSE THE JUDGE DID NOT ALLOW AFFIDAVITS OF APPELLANT'S RELATIVES TO BE READ INTO THE RECORD?

The appellant argues that he was deprived of a fair and rational sentencing phase because the prosecutor misinformed the jury about the nature of mitigation and because the judge did not allow the reading of evidence contained in affidavits by his brother and sister. Defense counsel's motion for a continuance after the guilty verdict in order to depose the appellant's brother and sister in Florida was denied by the trial court. Thereafter, the trial court refused the defendant's request for affidavits of the mitigation evidence to be read in the penalty phase of the trial. All parties then agreed to the alternative of allowing the defense counsel to read this mitigation testimony from the original trial transcript to the jury. The trial court also ruled that the improper cross-examination of the witnesses by the prosecutor in the first trial would be deleted. Based on all of these actions it cannot be said that the trial court abused its discretion in denying the appellant's motion to delay the penalty phase of the trial. There were indications in the record that subpoenas had been issued for the proposed witnesses, but apparently they had taken measures to avoid having to testify by avoiding service of process. Furthermore, the proposed witnesses had no contact with the appellant between his first and second trials and thus, little or no additional evidence could have been elicited from them that was not available at the first trial. Any evidence which would tend to mitigate

the seriousness of the crimes would have been available at the first trial and therefore the transcript of their testimony should have sufficed.

Additionally, the appellant contends that he was deprived of a fair sentence because the prosecutor misinformed the jury about the nature and role of mitigation evidence by claiming that the mitigation evidence did not "excuse" the crime. The appellant is correct in asserting that the prosecution cannot argue to the jury not to consider the evidence, but this Constitutional protection does not prevent the prosecutor from arguing to the jury that it should be given little consideration in regards to sentencing for the crimes committed. *Boyde v. California*, 494 U.S. 370, 384–86, 110 S.Ct. 1190, 1200–01, 108 L.Ed.2d 316 (1990). *Boyde* also held that prosecutorial comments on mitigating evidence are not as influential as jury instructions from a judge. This further supports the conclusion that the appellant's Constitutional guarantees were not violated.

Given that the trial court acted fairly in refusing to delay the penalty phase for an additional week and that the prosecutor did not overstep the bounds of fairness by arguing that the mitigating evidence did not "excuse" or lessen the seriousness of these crimes, no error occurred for these reasons in the sentencing of the appellant.

### VIII. WAS IT ERROR TO PERMIT THE PROSECUTION TO IMPEACH ITS OWN WITNESS UPON RECALL BY THE DEFENSE?

The Commonwealth introduced Tommy Wallace, Jr., as a witness during the guilt phase of the trial. The defense then introduced Mr. Wallace as a witness during the sentencing phase of the trial. At that time the prosecution, on cross-examination, impeached the witness with a prior felony conviction. The appellant now contends that the prosecutor's acts were prejudicial and necessitate a reversal.

The appellant cites *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in support of his contention that the

prosecution violates due process when it withholds evidence which tends to exculpate the accused. He also points to *Romans v. Commonwealth*, Ky., 547 S.W.2d 128, as requiring exclusion of any evidence which was not provided in accordance with a discovery order. The appellant claims that the prosecution, in compliance with the order, had to provide a criminal record of its witnesses, however, this was not proven by the record and the trial judge had no such recollection of any discovery order. Sanborn also argues that the lack of knowledge of the conviction prevented his defense counsel from impeaching the witness during the guilt phase, and that our decision in *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534 at 548, holds that it is reversible error not to be able to impeach a witness. Finally, the appellant claims that the introduction of the conviction was far more prejudicial than probative and that it should not have been admitted.

 The Commonwealth contends that this issue is not properly preserved on appeal because the defense counsel failed to get a final ruling on the objection to introducing the impeachment evidence. This Court has held that if a party objects to something, he must try to get a final ruling on the objection, or it is waived. *Bell v. Commonwealth*, Ky., 473 S.W.2d 820 (1971). However, assuming that the issue is preserved or that fairness dictates that we consider it despite the failure of defense counsel to preserve it, the record shows that the defendant was not "sandbagged" as he claims by the prosecutor's conduct. *Brady* addresses the issue of a prosecutor who conceals evidence from a defendant. It does not require that a party disclose information which is part of a public record, such as a felony conviction. Additionally, the Commonwealth's Attorney did not himself become aware of the conviction until the sentencing phase of the trial, at which time he approached the bench about questioning Tommy Wallace, Jr., about his conviction. This suggests that there was no bad faith motivating a non-disclosure of the conviction in the discovery order.

 The appellant is correct in his assessment of *Romans* and the exclusion of such evidence. However, *Romans* also requires the party claiming error to take every reasonable step to rectify the situation at trial before he can claim a mistrial at a later point in time. In this case the defense counsel objected, but then failed to get a definitive ruling upon the objection. Therefore, the appellant did not take every reasonable step to correct the situation and thus cannot claim a mistrial at this time. Furthermore, the limitation upon impeachment testimony in the original *Sanborn* case was not considered a reversible error standing alone but, rather, was part of cumulative error. Therefore, since the trial court did not abuse its discretion in allowing the Commonwealth to impeach Tommy Wallace, Jr., and the appellant has failed to establish that he was prejudiced by its admission, we find no reversible error.

## IX. PROPORTIONALITY REVIEW.

 Pursuant to KRS 532.075, we have reviewed the death sentence imposed herein. It is our opinion that this sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor and that the evidence supports the finding of an aggravating circumstance. The sentence was imposed by the jury herein, and the trial judge is entitled to give weight to the recommendation of the jury. *See Gall v. Commonwealth*, 607 S.W.2d 97 (1980).

We have considered whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, as required by statute, and have therefore considered the circumstances of the crimes committed here and all evidence surrounding the appellant and his background. The information used in considering this penalty has been compiled in accordance with KRS 532.075(6)(a), (b), (c). We have considered all the cases in which the death penalty was imposed after January 1, 1970, considering both the crime and the defendant. Those cases have been previously recited by this Court most recently in *Simmons v. Commonwealth*, Ky., 746 S.W.2d 393 (1988). That list is incorporated herein by reference and our review in this case is in accordance with KRS 532.075(5). In addition, we have

also considered the cases of *Moore v. Commonwealth*, Ky., 771 S.W.2d 34 (1989); *Epperson and Hodge v. Commonwealth*, Ky., 809 S.W.2d 835 (1991); *Taylor v. Commonwealth*, Ky., 821 S.W.2d 72 (1991); *Wilson v. Commonwealth*, Ky., 836 S.W.2d 872 (1992); and *Bussell v. Commonwealth*, Ky., 882 S.W.2d 111 (1994). We have conducted an independent review of all the circumstances and conclude that they exceed any minimum justifying capital punishment.

In accordance with all the above, the judgment and sentence of the Jefferson Circuit Court are affirmed.

STEPHENS, C.J., and LAMBERT, REYNOLDS and WINTERSHEIMER, JJ., concur.

STUMBO, J., dissents by separate opinion in which LEIBSON, J., joins.

STUMBO, Justice, dissenting.

Respectfully, I must dissent. The testimony of Reverend Brown was inadmissible, as it was given in violation of both Appellant's attorney-client privilege and his clergy-communicant privilege. It is clear from the record that Reverend Brown first met Appellant through counsel, and acted throughout the first trial as a part of the defense team and as spiritual counselor to Appellant. His meetings with Appellant were initiated at the request of counsel, and he sat at counsel table with Appellant during that first trial. Appellant's attorney during the first trial testified that she considered Reverend Brown a part of the defense team, and that she specifically told Reverend Brown that his communications with Appellant were confidential in nature because he was a member of the defense team.

While not in effect at the time of this trial, the Kentucky Rules of Evidence define the general rule of privilege as follows:

A client has a privilege to refuse to disclose and to prevent any other person from disclosing the confidential communication made for the purpose of facilitating the rendition of professional legal services to the client:

(1) Between the client or a representative of the client and the client's lawyer or a representative of the lawyer....

KRE 503(b)(1).

"Representative of the lawyer" means a person employed by the lawyer to assist the lawyer in rendering professional legal services.

KRE 503(a)(4).

In *Asbury v. Beerbower*, Ky., 589 S.W.2d 216 (1979), this Court held that communications between Beerbower and her insurance company were protected by her attorney-client privilege.

The insured is ordinarily not represented by counsel of his own choosing either at the time of making the communication or during the course of litigation. Under such circumstances we believe that the insured may properly assume that the communication is made to the insurer as an agent for the dominant purpose of transmitting it to an attorney for the protection of the interests of the insured.

*Supra*, at 217 (quoting *People v. Ryan*, 30 Ill.2d 456, 197 N.E.2d 15, 17 (1964)).

Appellant did not choose his own defense counsel at his previous trial; rather, said counsel was appointed for him and counsel instructed him to cooperate with Brown because any communications made to Brown would be covered by the attorney-client privilege.

To determine whether the attorney-client privilege is applicable, we should look at the facts from the client's perspective. Would Appellant have revealed the very information that allowed the jury to find that the victim was alive at the time of the sexual assault? I think not.

The clergy-communicant privilege applies to confidential communications made between a person and a clergyman in his professional character as a spiritual advisor. Brown, himself, testified that he ministered to Appellant and to the entire defense team. He prayed with and over Appellant, and expressed concern about the state of Appellant's soul, and prayed with him out of that concern. Brown testified that he sought and obtained confessions from Appellant, and

prayed over Appellant when he admitted guilt, urging Appellant to think of the victim's young children and their feelings when the Appellant allegedly expressed "no remorse." Appellant's prior counsel testified that Brown prayed with Appellant and his lawyers during pretrial hearings and during trial recesses. Brown's own testimony revealed that Appellant did not voluntarily confess to Brown, but rather confessed only upon repeated questions and over a period of time. Further, there is no evidence that Appellant spoke with Brown as a friend or in any capacity other than as a minister. In *Wainscott v. Commonwealth*, Ky., 562 S.W.2d 628, *cert. denied*, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978), this Court stated that in order to invoke the minister-penitent privileges provided in KRS 421.210(4), the statement must be made to the minister in his professional capacity. *Id.* at 632–633. In that case, Wainscott asked a friend, who happened to be a minister, to come to the police station and meet with him. After conferring with the minister, Wainscott "wanted the Reverend Weiss to tell the police that he (Danny) had murdered Brenda." Wainscott also "authorized the Reverend Weiss to accompany the police detectives, who found the knife where Danny told them he hid it. The Reverend Weiss testified that before Danny confessed, he '[r]elated some facts which he, in turn, asked me to relate to the detectives outside.'" *Wainscott,* at 632–633. Thus it was clear to the court in *Wainscott* that the defendant therein spoke with the minister as a friend, rather than in his professional capacity.

Here, there is no evidence that Appellant spoke to Brown other than as a member of the defense team and as his spiritual counselor. Brown's testimony was completely inadmissible.

LEIBSON, J., joins in this dissent.