*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0389p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

PARRAMORE L. SANBORN,
   *Petitioner-Appellee/Cross-Appellant,*

    *v.*

PHIL PARKER, Warden, Kentucky State
Penitentiary,
   *Respondent-Appellant/Cross-Appellee.*

Nos. 07-5309; 07-5310

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 99-0678—Jennifer B. Coffman, Chief District Judge.

Argued: January 22, 2010

Decided and Filed: December 21, 2010

Before: MERRITT, BOGGS, and MOORE, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** William Robert Long, Jr., OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellant. Jennifer M. Kinsley, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Ian G. Sonego, David A. Smith, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellant. Jennifer M Kinsley, Cincinnati, Ohio, Armand I. Judah, JUDAH & McLEOD, Louisville, Kentucky, for Appellee.

————————————

## OPINION

————————————

  BOGGS, Circuit Judge. Warden Phil Parker ("Parker") of the Kentucky State Penitentiary appeals the judgment of the district court granting in part the application for a writ of habeas corpus of Parramore Sanborn ("Sanborn"). That judgment was entered on the grounds that the admission of certain testimony at the penalty phase of Sanborn's

1

capital-murder trial constituted unconstitutional governmental interference with the right to counsel in violation of the Sixth Amendment. Sanborn himself cross-appeals from the district court's denial with prejudice of several alternative grounds for habeas relief. For the reasons discussed below, we reverse the judgment of the district court insofar as it granted habeas relief, and affirm it in all other respects.

**I**

Like many cases in which a habeas petitioner has been convicted of a capital offense, this one comes to us with a lengthy and intricate factual and procedural history.

On October 12, 1983, Sanborn murdered and sexually assaulted Barbara Heilman. Sheriff Ray Powell and Deputy Sheriff Franklin "Hoss" Sanders were dispatched to Ms. Heilman's home, where they found her car sitting in the driveway. They found hair curlers and a pair of eyeglasses just outside one of the car's doors and more curlers a few feet from the car. There was also blood on the ground. The gear-shift indicator had been ripped from the steering wheel, there were blood spots inside the car, the ignition was still in the "on" position, and the keys were covered with mud. There was long hair wrapped around the turn signal on the steering column. Detective Robert Perkins testified that some of the curlers on the ground had been stomped into the ground and that bobby pins and longs strands of hair were still attached to many of them. An umbrella was wedged into the driver's side door, and in addition to the ignition being "on," the transmission was in "drive." Detective Perkins also found a small piece of human flesh on the armrest of the driver's door and a large amount of mud on the panel of the driver's door. He also found blood in a grassy area about five feet from the rear bumper toward the home.

During the police canvas of the neighborhood, Sanborn answered the door at the Carder home,[1] and he invited them inside. Sanborn kept his hands tucked underneath his crossed arms while the officers were speaking with him, so Officer Glen Smith shook Sanborn's hand and asked to examine his hands. Sanborn consented, and Smith observed blood around Sanborn's cuticles and noticed streaks of blood on Sanborn's right pants' leg. After advising Sanborn of his constitutional rights, Smith asked to see the clothes he had worn the previous evening. When Sanborn showed him his boots, Smith saw bloodstains on the right

---

[1]Sanborn lived with the Carders at the time.

boot.  Officers who had remained outside saw a significant amount of blood in Sanborn's car.

Sanborn was taken into custody at approximately 12:50 p.m. on October 13, 1983.  Police officers swabbed Sanborn's mouth, penis, and fingernails; collected hairs from his head; and took a blood sample. Sanborn confessed that Ms. Heilman was "hurt bad" and that he had left her near Sulphur Dam on Martini Lane in Henry County, Kentucky. When her body was discovered approximately four to seven feet from the road, she was wearing only a yellow blouse, a tan bra, and blue socks. She had sustained multiple stab wounds to the right side of her body, in her neck area, and in her left hip area.  Her shoes, jacket, jeans, and panties were found approximately three to four miles away on the following day.

Evidence was recovered from Sanborn's vehicle and home.  From his car, the police collected blood from the passenger seat, a blood-soaked paper towel from the passenger's side floorboard, hair, seat cushion foam, fibers from the car seat and carpet, and a towel with hair wrapped in it.  There were also muddy footprints and scuffs on the passenger-side dashboard, and the passenger seat cover was torn and parts from that seat were lying loose on the front seat.  The trunk contained a red t-shirt, white jockey shorts, a blue flowered towel, a white towel, portions of the front seat cover, and a paper towel, all of which were soaked or smeared with blood.  From Sanborn's residence, the police took the boots and jeans he had worn the night of the murder, a Shrade lockback knife and sheath, a leather belt, several pocket knives, a Maxim hunting knife and sheath, and a stag-handled knife and sheath.

*Sanborn v. Parker*, No. 99-678-C, 2007 WL 495202, at *1–2 (W.D. Ky. Feb. 14, 2007) ("*Sanborn IV*").

Sanborn was tried on charges of murder, first-degree kidnaping, first-degree rape, and first-degree sodomy in the Henry County Circuit Court from January to March 1984. *Sanborn v. Commonwealth*, 892 S.W.2d 542, 545 (Ky. 1995) *as modified on denial of reh'g* ("*Sanborn II*").  He was convicted on all counts, and sentenced to death for the murder and to life imprisonment for each of the other three felonies.  *Ibid.*  On appeal, that conviction was reversed by the Kentucky Supreme Court for prosecutorial misconduct and for errors committed regarding the admissibility of evidence.  *Id.* at 545–46 (citing *Sanborn v. Commonwealth*, 754 S.W.2d 534 (Ky. 1988) ("*Sanborn I*")). The matter was remanded for a new trial; on remand, the original trial judge recused

himself and granted a change of venue to Jefferson County, Kentucky, where the case was presided over by Special Judge William L. Shadoan. *Sanborn II*, 892 S.W.2d at 546.

At the [second] trial, a forensic scientist testified that fibers found on Ms. Heilman's blouse matched those from the car seat, seat cover, and bluish-green foam of Sanborn's vehicle. Red fiber embedded in a pubic hair that was found in her mouth matched the fibers from the red t-shirt taken from Sanborn's car trunk. Fibers from the t-shirt were also found on Ms. Heilman's panties. The blue fibers found on her blouse matched the fibers from the carpet in Sanborn's car. Other fibers from her blouse matched the fibers from the white towel taken from the trunk of Sanborn's car. Fibers from the victim's blouse were found on a piece of seat cover that was in Sanborn's trunk. Fibers matching the carpet from Sanborn's car were found under Ms. Heilman's fingernails. Finally, fibers found on her jacket matched the fabric taken from the seat of Sanborn's car.

A serologist testified that Sanborn's pubic hairs were found in Ms. Heilman's pubic area, between her lower lip and chin, on her blouse, and on her nose. Two pubic hairs found inside her mouth were identified as hers, and two others were Sanborn's. A hair from Sanborn's head was found on her blouse, and a hair from Ms. Heilman's head was found on a towel confiscated from Sanborn's car. Ms. Heilman's blood was found on Sanborn's fingernails, his right palm and fingers, the white jockey shorts in his trunk, the buckle of the belt taken from his trunk, a Sharp knife and sheath and the Maxim hunting knife and sheath, the passenger seat in his car, the foam from the passenger seat in his car, and the paper towel found in his trunk, and also in the Heilmans' driveway.

The Commonwealth's Assistant Chief Medical Examiner, Dr. Barbara Weakley-Jones, performed an autopsy on Ms. Heilman. Weakley-Jones testified that Ms. Heilman died from multiple stab wounds. She had defensive wounds on her hands. There were three postmortem stab wounds to her left side and back hip area, which were similar in location to cuts found in the jeans she had been wearing that night. Organic material and leaves were found in the victim's vagina, indicating vaginal penetration, although there was no sperm in or injury to her vagina or mouth, and there was no evidence of trauma to her vagina. Weakley-Jones testified that the absence of vaginal injury is not inconsistent with the theory that she was sexually assaulted while she was alive, given her age and marital status.

There was also testimony of incriminating statements, other than his confession, that Sanborn made. Rodney Tingle, who was incarcerated

with Sanborn, testified that during an altercation with another inmate, Sanborn had said "I killed but once but they can't kill me but once." Reverend Barclay Brown testified that, in response to his question whether Ms. Heilman was alive when he raped her, Sanborn said, "Preacher, that doesn't make any sense," and, "All I remember is, that she was screaming."

Sanborn moved for a directed verdict of acquittal on all charges at the close of the prosecution's case, and the trial court denied the motion.

Although Sanborn had intended to establish that he had murdered Ms. Heilman as a result of extreme emotional disturbance ("EED") through the testimony of Dr. Phillip Johnson, the court prohibited Johnson from testifying to the "triggering event" that purportedly caused the EED or to any "self-serving" statements made by Sanborn. Johnson testified by avowal. The evidence offered in Sanborn's defense consisted largely of his having been drinking the evening of the murder.

Defense counsel moved for a mistrial based on an article in the *Louisville Courier-Journal* and a local television news story that stated that Donna Boyce, co-defense counsel, had stolen the prosecutor's voir dire notes at the beginning of Sanborn's second trial. The trial judge overruled the motion after he polled the jury and determined that none of the jurors had read the story or seen the broadcast.

The jury was instructed on rape, sodomy, and abuse of a corpse. The jury found Sanborn guilty of intentional murder, first-degree kidnaping, first-degree rape, and first-degree sodomy. The jury fixed a sentence of 95 years each for kidnaping, rape, and sodomy. The penalty phase for the capital murder conviction followed.

. . . .

Sanborn did not testify during the penalty phase, although he offered several character witnesses. Sanborn is the youngest of ten children, and two of his siblings, Clifford and Maxine, testified on his behalf. Clifford, who is fifteen years older than Sanborn, testified that the family lived in a small fishing village and was quite poor. He stated that Sanborn's paternity was always questioned, and he described Sanborn as a loner who essentially raised himself. He commented that Sanborn stuttered and was frequently teased because of his impediment. Clifford described Sanborn's relationship with their older brother Jack as "the worst kind there could possibly be," because Jack was hostile and physically violent toward Sanborn. Maxine confirmed that Jack frequently humiliated Sanborn and that their mother never wanted him.

Doctor Johnson commented on the uncertainty of Sanborn's parentage and the abusive nature of his childhood environment. Sanborn had no contact with his biological father, his mother was psychologically and physically abusive, and his brother Jack was physically and verbally abusive. Johnson testified that Sanborn's stuttering was aggravated by stress and that he was teased about his problem as a child. Johnson also opined that Sanborn suffered from poor self-esteem, did not feel valued, and drank to relieve his depression and social anxiety. Johnson stated that Sanborn had poor impulse control when he was drinking alcohol.

Johnson diagnosed Sanborn with a full-scale IQ of 84, alcohol dependency, amphetamine abuse, antisocial personality disorder, and avoidant personality disorder. Johnson's diagnosis of antisocial personality disorder was rendered on the basis of Sanborn's inability to hold a job, conform to social and legal norms, honor financial obligations, remain faithful in relationships, or plan for his future. He described Sanborn's irritability and aggression as also indicative of the disorder. Johnson further testified that the disorder typically results in a lack of regard for the truth, physical recklessness, financial irresponsibility, and lack of remorse for wrongdoing. Because of Sanborn's avoidant personality disorder, Johnson testified, he feels uncomfortable in social situations and is easily hurt by criticism or disapproval.

According to Sanborn, said Johnson, Ms. Heilman's husband, Jack, was verbally abusive toward Sanborn and was unfair with regard to some financial arrangements. Johnson believed that Sanborn's anger toward Jack Heilman was actually misplaced anger Sanborn felt toward his brother Jack. Johnson believed this misplaced anger was a critical factor in Ms. Heilman's murder. Johnson's testimony at the penalty phase as to Sanborn's account of Ms. Heilman's murder is substantially similar to the testimony he gave by avowal at the guilt phase, which is detailed below. Additionally, he testified that Sanborn denied that there was any sexual contact. Johnson also related Sanborn's claim that Ms. Heilman had told Sanborn that if she ever died, she wanted to die naked in his arms; Johnson found that story to be "farfetched."

Doctor Victoria Skelton, a forensic psychiatrist from the Kentucky Correctional Psychiatric Center, testified in rebuttal. . . . Skelton stated that in one of Dr. Johnson's reports, Sanborn had claimed that his mother was "very loving," and refuted the claim that she had been physically abusive with the assertion that she had been a "strict disciplinarian." Skelton diagnosed Sanborn with alcohol dependency and amphetamine abuse, and she agreed with Johnson that he suffered from antisocial personality disorder. Although she agreed that Sanborn had traits that were consistent with avoidant personality disorder, she did

not believe he suffered from the disorder itself, and she did not find any signs of major depression.

. . . .

The jury recommended that Sanborn be sentenced to death. The trial court conducted a sentencing hearing on May 14, 1991, and sentenced Sanborn to 95 years each on the counts of kidnaping, rape, and sodomy, for a maximum term of 285 years. The trial court sentenced Sanborn to death on the count of intentional murder.

. . . .

The Kentucky Supreme Court affirmed the conviction and the imposition of the death penalty on direct appeal [in *Sanborn II*].

. . . .

Sanborn unsuccessfully sought post-conviction relief under Kentucky Rule of Criminal Procedure 11.42. *Sanborn v. Commonwealth*, 975 S.W.2d 905 (Ky.1998) *as modified on denial of reh'g ("Sanborn III")*. Sanborn then filed the present federal habeas corpus petition, arguing that errors relating to both trials mandate federal habeas corpus relief.

*Sanborn IV*, 2007 WL 495202, at \*1–5 (internal citations and one footnote omitted).[2]

In his federal habeas petition, Sanborn alleged thirty-two points of error. *Id.* at \*5. Following a magistrate judge's recommendation that the petition be denied, Sanborn filed objections to the magistrate judge's report with the district court on ten grounds. *Id.* at \*6. Although the district court ultimately adopted the magistrate judge's report, it did so only after modifying that report so as to grant Sanborn's habeas petition on the grounds that the admission of Dr. Skelton's testimony at the penalty phase of Sanborn's second trial constituted unconstitutional governmental interference with the right to counsel in violation of the Sixth Amendment. *Id.* at \*34. The district court denied all of the other claims presented by Sanborn's habeas application, vacated his sentence of death, affirmed his convictions, and remanded to the state trial court for further proceedings. *Id.* at \*34–35. At the same time, the district court granted Sanborn a

---

[2]As a summary of the various prior "*Sanborn*" opinions cited to this point, we note that the Kentucky Supreme Court opinion vacating Sanborn's first conviction was *Sanborn I*, the Kentucky Supreme Court opinion affirming his second conviction was *Sanborn II*, the Kentucky Supreme Court opinion affirming the denial of state postconviction relief was *Sanborn III*, and the district court opinion denying federal habeas corpus was *Sanborn IV*.

Certificate of Appealability ("COA") as to three issues, all of which related to the use of Reverend Brown's testimony during Sanborn's second trial.

On March 7, 2007, Warden Parker and the Attorney General of the Commonwealth of Kentucky filed a Notice of Appeal from the district court's judgment granting habeas relief to Sanborn.[3]  On March 14, 2007, Sanborn followed with his own notice of appeal as to the three issues on which the district court had granted a COA.  We subsequently granted a motion to expand Sanborn's COA to include four additional issues.  The Warden's appeal was designated Case No. 07-5309; Sanborn's appeal was designated Case No. 07-5310.  Both appeals were consolidated for briefing and argument, and we decide them both now.

## II

"We review de novo a district court's decision to grant or deny a petition for a writ of habeas corpus."  *Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2006).  A habeas application that is made by a person in custody pursuant to the judgment of a state court may be entertained "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

Because Sanborn's habeas petition was filed in October 1999, it is subject to the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320, 326–27 (1997).  AEDPA provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[3]No COA was required for the Commonwealth of Kentucky to appeal from the district court's judgment granting Sanborn's application in part.  *See* Fed. R. App. P. 22(b)(3).

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In determining what constitutes "clearly established Federal law" for the purposes of § 2254(d), a federal court may look only to the holdings of the Supreme Court's decisions, as distinct from dicta. *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"A state-court decision is contrary to clearly established federal law if the state court applies a rule that contradicts the governing law set forth in the Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from that precedent." *Joseph*, 469 F.3d at 449–50 (citation, internal quotation marks, and alteration marks omitted).

A state-court decision involves an unreasonable application of clearly established federal law, on the other hand, if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *Williams*, 529 U.S. at 407–08, or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context," *Seymour v. Walker*, 224 F.3d 542, 549 (6th Cir. 2000). However, "[a] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly." *Price v. Vincent*, 538 U.S. 634, 641 (2003). Rather, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (citations omitted).

## III

We first examine the issue raised in Appeal No. 07-5309, in which Warden Parker appeals the district court's judgment to the extent it granted Parramore Sanborn's petition for a writ of habeas corpus and vacated Sanborn's death sentence.

A

Prior to his state-court retrial, Sanborn, through counsel, notified the prosecution that he would seek to establish that his actions were precipitated by an extreme emotional disturbance (EED). Under Kentucky law, proof that a defendant acted under an EED "for which there is a reasonable explanation or excuse" renders the defendant not guilty of murder (he is instead guilty of manslaughter in the first degree) if such proof is presented at the guilt stage of the trial. Ky. Rev. Stat. § 507.020(1)(a). Moreover, a jury must be instructed to consider evidence that the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance at the penalty phase if the evidence supports such an instruction, even if the influence of the EED was not sufficient to constitute a defense to the crime; the jury may then consider the EED as a mitigating factor when evaluating whether a capital sentence is appropriate. Ky. Rev. Stat. § 532.025(2)(b)(2).

Following Sanborn's notice of his intent to present EED evidence, the prosecution sought and obtained a court order permitting them to have Sanborn examined by their own mental health expert, Dr. Victoria Skelton, a psychiatrist at the Kentucky Correctional Psychiatric Center. Dr. Skelton examined Sanborn on Friday, March 8 and Monday, March 11, 1991. In accordance with the court's order, Sanborn's own mental health expert, Dr. Phillip Johnson, attended Dr. Skelton's sessions with Sanborn.[4]

---

[4]The split session (three hours on March 8 and three hours on March 11) was done to accommodate the schedule of Dr. Johnson. The report itself was transmitted to Judge Shadoan on March 14, 1991, with copies to both defense counsel and the prosecution.

Dr. Skelton's interviews resulted in a twenty-nine page report, some twenty-five of which dealt with Sanborn's family dynamics, substance abuse problems, employment history, schooling, and other background matters. In the first page of the report, however, Dr. Skelton indicated that, during their meeting on Friday, March 8, 1991, Sanborn told her that he had been "nowhere around the vicinity or near the alleged victim at the time in question, instead stating that he had gone to Carrollton on three different occasions during the time in question in order to buy alcohol."

Skelton's report then noted that Sanborn's story changed on March 11, and that on that occasion Sanborn said he wanted to "clarify" what he had said on March 8. Sanborn then went on to relate a story in which he happened to drive his car through a water-filled hole, causing his car to stall at the foot of the victim's driveway. Sanborn further told Skelton that he and Ms. Heilman had been having an affair for approximately four years, about which he was feeling guilty. Nevertheless, he said, he knocked on the Heilmans' door and asked Ms. Heilman for a ride home. She agreed, and they got into her car, at which point Heilman (according to Sanborn) began "teasing him in a sexual fashion" and saying that she wanted to have sex with him. When Sanborn refused, Heilman allegedly became "hateful," called Sanborn an alcoholic, and slapped him. The rest of Sanborn's March 11 story was somewhat disjointed; he told Skelton that there was a struggle, that he remembers having his knife out but not using it, and that he remembers putting Heilman (who "would not wake up") in his car and driving her to another location in the county. He further told Skelton that Heilman had, on one occasion, said that she wanted to "die naked in his arms," so he took her clothes off and began carrying her down a road, but that he tripped and her body fell off the road. After being unable to find the body, Sanborn told Skelton, he threw Heilman's clothes away.

Of central importance to this issue is a single paragraph in Skelton's report following her description of Sanborn's March 11 story:

> When I asked him why he had not told me the second version on Friday when I asked him about the alleged incident, he said, "I was going to and somehow or another I got off onto something else." I then asked

Mr. Sanborn who he had had contact with between my two evaluations and he stated that the only person who visited him was his defense attorney, Mr. Oleh Tustaniwsky. I also asked him about his defense strategy, he stated that his defense was that the act was done under emotional distress.

At trial, Dr. Johnson was not permitted to testify as to the existence of a "triggering event" of the EED that allegedly caused Sanborn to act the way he did, because Dr. Johnson conceded that his knowledge of those events was based only on what Sanborn had told him. Kentucky law requires proof of such a triggering event in order to establish an EED defense at the guilt phase. *See Greene v. Commonwealth*, 197 S.W.3d 76, 81–82 (Ky. 2006). Therefore, the defense did not put on an EED defense at the guilt phase, despite telling the jury during opening statements that Sanborn had acted because he was under EED, and the prosecution did not have occasion to introduce the testimony of Dr. Skelton to rebut that defense.

At the penalty phase, however, in which the jury was permitted to consider evidence of EED that would not have been sufficient to reduce the crime for which Sanborn was convicted from murder to manslaughter, both Dr. Johnson and Dr. Skelton testified. At the point in Dr. Skelton's testimony following her description of Sanborn's attempt to "clarify" his story on March 11, the following is reflected in the transcript:

> Q      And after that what, if anything, did you ask him, ma'am?
>
> A      I asked him why didn't you tell me this - - - -
>
> FEMALE DEFENSE COUNSEL:     May we approach the bench, Your Honor?
>
> YOUR HONOR:      Come up.
>
> (COLLOQUY BETWEEN ATTORNEYS AND YOUR HONOR.)
>
> MR. TUSTANIWSKY:      I object to any testimony about the fact that I visited him between the two visits because that is no business of the jurors when I visited my client and second of all, it's clearly being introduced for the inference that I had–that I coached him into changing his story.
>
> YOUR HONOR:      Did he tell him that?

MR. JASMIN [the prosecutor]:          (Inaudible)

MR. TUSTANIWSKY:          I strenuously object to that because I talked to my client. I have an attorney/client conversation with him and I object to any implication that I coached him.

YOUR HONOR:      I understand that. I know that - (Inaudible)

MR. TUSTANIWSKY:          None of that should come out. I don't see where any of that should come out. That he told them that I came to visit him.

The remainder of the colloquy appears to have been off the record.

Shortly after Dr. Skelton's testimony resumed, the following exchange took place:

Q     Dr. Skelton, don't give me any names of anybody you talked to. Okay? Did you ask him if he had talked to anyone between the 8th and the 11th? What did he say? Yes or no? Just answer yes or no.

A     Yes. He said yes.

Q     And after he gave you that answer, did you ask him anything about his strategy?

A     Yes.

Q     Just tell me what he said his strategy was.

A     That the act was done under emotional distress.

Q     All right. In dealing with your evaluations, Doctor, in addition---

MR. TUSTANIWSKY:          May I approach?

YOUR HONOR:      Yes.

MR. TUSTANIWSKY:          I move for a mistrial on the grounds that the answer that Mr. Jasmin—I move for a mistrial on the grounds that the answer to Mr. Jasmin elicited [sic] clearly implies that the attorney came to visit Mr. Sanborn between the two visits.

MR. JASMIN: Didn't imply anything. How else am I going to do it?

MR. TUSTANIWSKY: Well, who else would be visiting him?

MR. JASMIN:  Nita Carter[5] could visit him.  Anybody could be visiting him.

YOUR HONOR:  Overruled.  Let's go.

This testimony occurred approximately ten minutes into Dr. Skelton's testimony, which itself lasted about eighty minutes in total.  No other testimony about the visit or about Sanborn's reasons for changing his story was elicited.

On his direct appeal to the Kentucky Supreme Court, Sanborn argued that the trial court's ruling permitting Skelton to testify as indicated violated his right to counsel. *Sanborn II*, 892 S.W.2d at 553.  Sanborn argued that the Supreme Court's decision in *Estelle v. Smith*, 451 U.S. 454 (1981), supported his position that Dr. Skelton's testimony should have been excluded because it went beyond the scope of the discovery order, and that the information was self-incriminating and was obtained without defense counsel's knowledge.[6]  The Kentucky Supreme Court distinguished *Estelle*, however, on the grounds that the defendant in that case had not introduced psychiatric evidence, but rather submitted to psychiatric examination for the sole purpose of determining his competence to stand trial.  *Ibid.*  The Kentucky Supreme Court held that Sanborn's case was more similar to an exception articulated by the *Estelle* Court, that being "where a defendant introduces psychiatric evidence into the record, as Sanborn did, he must also submit to examination by the prosecution's expert for rebuttal purposes. . . .  If the statements are necessary for the expert to formulate and explain her opinion, then the statements are admissible and are not violative of the defendant's rights."  *Ibid.*

In specifically applying the *Estelle* exception, the Kentucky Supreme Court advanced the following rationale:

---

[5]This appears to be a reference to Lela Carder, from whom Sanborn was renting a room at the time of the murder.  Carder was called as a witness for the Commonwealth.

[6]In his current appeal, Sanborn explicitly disclaims any argument that the use of Skelton's testimony violated his Fifth Amendment privilege against self-incrimination.  Cross-Appellant's Br. at 23–24 ("It is not . . . Sanborn's Fifth Amendment privilege against self-incrimination that has been violated; it is his Sixth Amendment right to counsel.").

> The record shows that the trial court went to great lengths to prevent the jury from hearing that the defense counsel visited the appellant in the time between his two interviews with Dr. Skelton. Also, it was not improper for Dr. Skelton to inquire of the appellant as to why he changed his version of the facts between interviews. This information was helpful to Dr. Skelton in her evaluation of the appellant. Furthermore, the explanation was necessary for Dr. Skelton to explain the inconsistencies in the stories told to her by Sanborn. Granted, it would have been improper for Dr. Skelton to question Sanborn about his defense strategy per se, but at most it was harmless error. The testimony complained of was given during the penalty phase at which time guilt had already been determined. It is not improper for a jury to be informed of a change in a story by a defendant so that they may consider the motivation behind the change while determining the appropriate punishment for a crime.

*Ibid.* Thus the Kentucky court's position was that there was no constitutional error, and that even if there had been, no harm had resulted from it.

On consideration of Sanborn's habeas petition, Judge Coffman disagreed and granted Sanborn partial relief on the basis of this issue, vacating his sentence of death and remanding to the Kentucky trial court for further proceedings.[7] In so doing, the district court looked to *Weatherford v. Bursey*, 429 U.S. 545 (1977), which it characterized as requiring both a showing of an intrusion into the attorney–client relationship and a showing of prejudice before Sanborn could successfully make out a claim that the government's conduct had violated his right to effective assistance of counsel in this case. *Sanborn IV*, 2007 WL 495202 at *20.

With respect to the first inquiry under *Weatherford*, intrusion, the district court argued that

> While not necessarily improper when considered independently, Skelton's conjoined questions–about (1) Sanborn's meeting with his attorney and (2) his defense strategy–were tantamount to her asking what he and his attorney had discussed in that meeting. The unnecessary question about the meeting with counsel was not critical to her

---

[7] Judge Coffman denied the petition with respect to Sanborn's convictions for intentional murder, first-degree kidnaping, first-degree rape, and first-degree sodomy. *Sanborn IV*, 2007 WL 495202, at *34.

assessment of Sanborn's credibility and was a clear intrusion into the attorney-client relationship.

*Ibid.* The district court specifically held that Skelton's inquiry as to whom Sanborn had met between their sessions intruded into Sanborn's attorney–client relationship, even if her more general questions regarding the reason for his inconsistent stories did not. *Id.* at *21. In a footnote, the district court noted that two other opinions—one by the Sixth Circuit and one by the U.S. Supreme Court—had concluded that intrusions had occurred in roughly similar situations. The first of these cases involved the unexpected discovery of an attorney–client communication by prison officials searching a prisoner's cell, and the second involved an undercover informant's presence at an attorney–client meeting at the invitation of the attorney. *Id.* at *21 n.6. (citing *Bishop v. Rose*, 701 F.2d 1150, 1151 (6th Cir. 1983) and *Weatherford*, 429 U.S. at 548). From those two cases, the court reasoned that "if an intrusion can occur by chance or even at the invitation of defense counsel, the court has no trouble concluding that an intrusion occurred here as the result of Skelton's direct questioning, even assuming the answer to her question was unexpected." *Ibid.* Moreover, the district court held, Skelton already knew that Sanborn had given a different version of his story and that he was presenting an EED defense, and therefore "[s]he had no reason to delve into his meeting with his attorney." *Id.* at *21.

With respect to the prejudice prong of *Weatherford*, the district court held that the Kentucky Supreme Court's argument that any error was harmless because Skelton's testimony "was given during the penalty phase at which time guilt had already been determined" was "contrary to Sixth Circuit precedent." *Sanborn IV*, 2007 WL 495202, at *21. Specifically, the district court applied a four-factor analysis that took into account (1) whether the intrusion was the result of purposeful government conduct or was inadvertent; (2) whether the government obtained any information as a result of the intrusion that it later used at trial; (3) whether any information was otherwise used to the defendant's detriment; and (4) whether the government learned details of the defendant's trial preparation strategy by way of the intrusion. *Id.* at *22 (citing *United States v. Steele*, 727 F.2d 580, 586 (6th Cir. 1984)). The district court noted that both *Steele* and *Weatherford* found no prejudice in cases in which undercover agents had overheard

conversations between the defendant and defense counsel, but not relayed that information to the government nor testified as to what they had heard.  However, the district court distinguished Sanborn's case on its facts, in that the prosecution did make a conscious effort to convey details about Sanborn's meeting with his attorney to the jury.

The district court then extensively discussed and applied our decision in *Bishop*. In that case, the district court argued, we noted that *Weatherford* had been construed as holding that "a Sixth Amendment violation occurs if the government intentionally invades the attorney–client relationship or *privileged information resulting from an unintentional intrusion is disclosed and prejudice results*."  *Sanborn IV*, 2007 WL 495202, at *23 (citations omitted) (emphasis added by *Sanborn* court).[8]  According to the district court, the *Bishop* court found that "the obvious way to establish prejudice resulting from a disclosure is to show that the information was used for the benefit of the government or the detriment of the defendant." *Ibid.*  Therefore, because Dr. Skelton's testimony suggested that Sanborn was not actually acting under EED but had instead conjured up his second story after learning that his original story was not consistent with his attorney's proposed defense, the testimony was used to his detriment and was thus prejudicial.  Having satisfied itself that there had been both an intrusion and prejudice, the district court concluded that the government had violated Sanborn's right to effective assistance of counsel under *Weatherford*.

B

Our review of the Kentucky Supreme Court's decision on this issue is informed by the "contrary to" clause of 28 U.S.C. § 2254(d).  Although the Kentucky Court relied upon the Supreme Court's decision in *Estelle* to reach its own conclusion, the portion of *Estelle* it cited was dicta.  *See Estelle*, 451 U.S. at 472 ("In addition, a different situation [than the one before the Court] arises where a defendant intends to introduce psychiatric evidence at the penalty phase"); *Seminole Tribe of Fla. v. Florida*, 517 U.S.

---

[8]The decision construing *Weatherford* in this way was *United States v. Dien*, 609 F.2d 1038 (2d Cir. 1979).

44, 67 ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."). Hence the portion of *Estelle* relied upon by the Kentucky court was not "clearly established Federal law," and *a fortiori* could not have been an "unreasonable application"—or, for that matter, a "reasonable application"—of such law.

Therefore, the relevant question as to this issue is whether the Kentucky Supreme Court's decision was contrary to the clearly established federal law embodied in Supreme Court's holdings in *Weatherford*.

C

*Weatherford*, however, presented a significantly different question with respect to intrusion than the one before us now. In that case, an undercover agent attended sessions between the defendant and the defendant's attorney at the invitation of defense counsel, who believed that the agent was also being prosecuted for the same offense. Although the agent sat in on these sessions, he did not disclose any information he learned therein to his superiors or to the prosecution. The Court of Appeals for the Fourth Circuit held that the agent's actions violated the Sixth Amendment, because "whenever the prosecution knowingly arranges and permits intrusion into the attorney-client relationship the right to counsel is sufficiently endangered to require reversal and a new trial." *Weatherford*, 429 U.S. at 549 (quoting *Bursey v. Weatherford*, 528 F.2d 483, 486 (4th Cir. 1975)).

The Supreme Court reversed, on the grounds that a Sixth Amendment violation in this context requires not just intrusion but prejudice as well. In so doing, the Court presumed that the presence of an undercover agent in an otherwise-privileged meeting was an "intrusion," which is not surprising, but also not remotely analogous to Sanborn's case. Sanborn, like the district court, argues that if intrusion can occur at the behest of defense counsel, then surely it can occur via an unexpected disclosure; however, he points us to no case in which the Supreme Court has ever said as much, nor can we find one. Moreover, there is a clear difference between voluntarily attending a session between a defendant and his attorney in which a privileged conversation can be expected

to occur, as happened in *Weatherford*, and asking follow-up questions in an unprivileged conversation that produces answers that do not implicate *Weatherford's* concerns.

This is particularly true in the context of our case. It seems illogical to believe that Dr. Skelton could permissibly inquire as to the basis for Sanborn's about-face, but could not ask whether anyone else was involved, especially when Skelton did not specifically mention Sanborn's lawyer. *See Geders v. United States*, 425 U.S. 80, 89–90 (1976) ("A prosecutor may cross-examine a defendant as to the extent of any 'coaching' during a recess, subject, of course, to the control of the court. Skillful cross-examination could develop a record which the prosecutor in closing argument might well exploit by raising questions as to the defendant's credibility, if it developed that defense counsel had in fact coached the witness as to how to respond on the remaining direct examination and on cross-examination."). Indeed, the district court's analysis would seem to indicate that even Skelton's initial inquiry as to why Sanborn had not told her the new version of his story at their original meeting (which Sanborn answered "I was going to and somehow or another I got off onto something else") was on shaky ground; had Sanborn answered "because my lawyer told me it would be better this way," the district court's reading of *Weatherford* would make the question an intrusion retroactively.

In our case, the only question that could be considered problematic would be Dr. Skelton's third question "about his defense strategy," but here too, our case is quite different from *Weatherford*. *Weatherford* dealt only with an informant sitting in on attorney–client conversations about which the informant would otherwise have been ignorant. Here, however, Skelton was in control of the tenor of the conversation, and because she already knew what defense Sanborn was asserting, her third question was not obviously designed to elicit additional information. *See Sanborn IV* at \*20 ("Skelton knew of the reason for her appointment: the defendant's notice that he would use the EED defense. In other words, she could ask about his strategy because she already know what his strategy was.").

The district court also errs in its intrusion analysis when it argues that Skelton's question as to whether Sanborn had met with anyone was inappropriate because she "had

enough information to doubt Sanborn's changed story from the two facts she already possessed: that he had earlier given a different version and that he was presenting an EED defense." Doubt is not binary. Indeed, it would be a logical fallacy for Dr. Skelton simply to assume that someone who changed his story could not increase or decrease the amount of doubt thereby created, based on his explanation for the discrepancies between the two versions. Because Skelton's role was not merely to decide whether she doubted Sanborn's story but to what *extent* she doubted it, her follow-up question—which, we note again, was not directed to whether Sanborn met with his lawyer—was appropriate. Thus, because no intrusion occurred, the Kentucky Supreme Court's decision on this issue was not contrary to *Weatherford*, and does not justify habeas relief.

## D

Moreover, it appears likely from the record that Sanborn was not prejudiced by Dr. Skelton's testimony on this issue; therefore, the Kentucky Supreme Court's decision would not have been contrary to *Weatherford* even if there had been intrusion. An examination of the four *Weatherford* factors does not indicate that the state court made an unreasonable application. Even if Skelton's questions are considered purposely designed to elicit information, purposeful intrusion alone is not a Sixth Amendment violation. *Steele*, 727 F.2d at 586 (citing *United States v. Morrison*, 449 U.S. 361, 365–66 (1981)). The other three *Weatherford* factors, as well, do not support finding a Sixth Amendment violation. The government did not obtain information from the legal-defense question apart from what it already knew; the information about the existence of the defense was not used to Sanborn's substantial detriment; and the government did not learn details about trial preparations.

The Kentucky Supreme Court also noted that the trial judge "went to great lengths" to ensure that the identity of Sanborn's visitor was not disclosed. Dr. Skelton was not permitted to reveal the fact that Sanborn's attorney visited him; at most, the jury *might* have inferred that fact from the juxtaposition of the "did he talk to anyone" question with the "what did he say about his strategy" question. As the prosecutor pointed out during the bench colloquy, however, Sanborn's visitor could have been

anyone. The AEDPA standard under which we evaluate the Kentucky Supreme Court's decision requires that we give that decision "the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). It is Sanborn's burden to demonstrate that the Kentucky court acted contrary to clearly established federal law in holding that the trial court's efforts to guard against the disclosure of Sanborn's visitor's identity prevented him from being *actually* prejudiced, as opposed to merely being exposed to the *possibility* of prejudice. He has failed to do so. *See Morrison*, 449 U.S. at 365–66 (requiring, in analogous context, "demonstrable prejudice" for a Sixth Amendment violation to demand reversal).

E

Of course, even if it were error to permit Dr. Skelton to testify as she did, the decision is subject to harmless-error review. *See Brecht v. Abramhamson*, 507 U.S. 619, 638 (1993) (holding that the harmless-error standard applies in determining whether habeas relief must be granted because of constitutional error in trial proceedings). Under *Brecht*, error is not harmless in a habeas case when it "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Thus, we can ask whether, even if the jury concluded that Sanborn's visitor was his attorney, that conclusion would have had an injurious effect on its decision to reject Sanborn's EED mitigation argument.

Sanborn theorizes that the jury's knowledge that he had met with his attorney between sessions with Dr. Skelton caused them to discredit his second story, and thus his EED mitigation argument. It seems clear, however, that this theory is seriously jeopardized by the fact that Sanborn's credibility had already been drastically undermined by testimony in both the guilt phase and the penalty phase. In particular, the jury had already heard that Sanborn had initially denied involvement to the police investigating the incident, then admitted he had been present but that "two brothers" he was with had performed the actual crimes, then admitted he had been alone at the time but gave inconsistent accounts of what he had done or what he could remember. Perhaps even more damning, Sanborn's own psychologist, Dr. Johnson, testified that Sanborn

suffered from antisocial personality disorder, and that such persons "often times . . . can tell a non-truth or they can tell a lie easily, maybe quickly, and they're not going to feel a lot of hesitation about that, they're not going to feel any pain of conscience about telling that lie." Dr. Johnson went on to testify that "Mr. Sanborn has not always told me consistent stories, and that's problematic. . . . So I don't have any doubts that Mr. Sanborn has lied at different times in his life. And perhaps many people will tell a white lie, if you will, occasionally. But that's not the type of deception that we're talking about in this sort of situation." Finally, of course, the jury also heard that Sanborn had told Dr. Skelton one story and then another, which in and of itself would have been evidence of a lack of credibility even if the testimony about his being visited by someone in the interim had been omitted.

It beggars belief to think that a jury, knowing full well that Sanborn's EED argument was key to his avoiding the death penalty, would credit the story he told Dr. Skelton on March 11, 1991, but for the inference that he had been coached into making it. Having heard of his constantly shifting stories, and testimony from his own expert that he was prone to deceit without remorse, a rational jury would surely have already seriously doubted Sanborn's credibility and inferred that his March 11 story was tailored to fit the EED argument even without hearing that he had met with someone. The torrent of already-presented evidence that Sanborn was untrustworthy simply swamps the trickle of doubt that may have been raised by the inference that he met with counsel—if indeed the jury made that inference. Because the alleged error has not been shown to have "had substantial and injurious effect or influence in determining the jury's verdict," therefore, we conclude that any such error was harmless, and did not warrant habeas relief.

F

Sanborn has not demonstrated that the use of Dr. Skelton's testimony during his trial was a constitutionally impermissible intrusion, nor that it was prejudicial. The Kentucky Supreme Court therefore did not act contrary to *Weatherford* or any other clearly established federal law in holding that the Commonwealth's use of that testimony did not violate his rights to counsel. Any error that might have occurred, moreover, was

harmless. We accordingly determine that Sanborn does not qualify for habeas relief on those grounds, and reverse the district court's judgment in Appeal No. 07-5309.

**IV**

Having determined that the district court erred in granting habeas on the above issue, it remains for us now to determine if it also erred in denying the writ on any of the other grounds presented to it. We conclude that no such error occurred.

A

Sanborn first argues that the district court erred in denying his habeas petition on the grounds that the Commonwealth's use of testimony by the Reverend Brown as evidence that Heilman was alive at the time she was unlawfully penetrated violated Kentucky's attorney–client and priest–penitent privileges.

The question of precisely when Heilman died was of critical importance during Sanborn's trial. Kentucky law provides that a criminal defendant who is convicted of murder may not receive the death penalty unless at least one statutorily–enumerated aggravating factor is found to have been present; among these aggravating factors is that "[t]he offense of murder . . . was committed while the offender was engaged in the commission of . . . rape in the first degree, or sodomy in the first degree." Ky. Rev. Stat. § 532.025(2)(a)(2). Under Kentucky law, however, rape and sodomy are offenses against the living only; the same acts, performed after the victim has died, constitute "abuse of a corpse"—an offense that is not among the aggravating factors that permit the imposition of the death penalty in Kentucky.

In December 1983, before Sanborn's first trial, defense attorney Bette Niemi ("Niemi") asked Reverend Brown "to serve as a defense expert regarding, among other things, a theological perspective of the death penalty and Sanborn's religious upbringing." *Sanborn IV*, 2007 WL 495202, at *7. To that end, Reverend Brown engaged in several discussions with Sanborn "about what [Sanborn] was feeling regarding the situation he was in (i.e. how he felt about being accused of murder.)." *Id.* at *8. Niemi later testified that she told Reverend Brown that he was considered to be

part of the defense team, and that the conversations he had with Sanborn while acting in that capacity were confidential. In January 1984, prior to the start of the trial, Niemi told Reverend Brown that she no longer expected to call him as a witness, but "that communications continue to be confidential even though he would not be a testifying witness."[9]

At some point—when, exactly, is disputed by the parties—Reverend Brown asked Sanborn whether Heilman had been alive when Sanborn raped her. Reverend Brown testified at Sanborn's second trial that Sanborn "at first said, 'Preacher, that doesn't make any sense,'" and later added that "[a]ll I remember is, that she was screaming." *Sanborn IV*, 2007 WL 495202, at *9.

Following the reversal of Sanborn's first-trial conviction by the Kentucky Supreme Court, Reverend Brown contacted a Kentucky county attorney and claimed that he was troubled by some of the things Sanborn had told him. Reverend Brown was later subpoenaed by the prosecutor in Sanborn's second trial, and testified as to the substance of the conversation in which Sanborn told him that Heilman had been screaming at the time of the rape. When Sanborn's second-trial counsel, Oleh Tustaniwsky, moved at the close of evidence for a directed verdict on the rape and sodomy charges on the grounds that insufficient evidence existed to prove that Heilman was alive when the unlawful penetration occurred, that motion was denied on the grounds that Reverend Brown's testimony that Heilman was screaming was sufficient to send the issue to the jury. Hence Sanborn now argues that, but for the Commonwealth's interference with attorney–client and priest–penitent privileges that existed at the time he made the incriminating statement to Reverend Brown, there would have been no basis for a jury to conclude that Heilman was alive at the time that she was unlawfully penetrated and no basis on which he could have received a sentence of death.

---

[9]Niemi also filed an affidavit in which she claimed that, after Rev. Brown was told in January 1984 that he would not be called as a defense witness, "he was again advised by [Niemi] that all conversations he had with Pat Sanborn or with [Niemi] were privileged communications and were to remain confidential." Notably, neither Niemi's affidavit nor her in-person testimony make clear whether she was referring exclusively to the conversations that Brown and Sanborn had already had, or whether she meant to include their future conversations as being among those that were to be considered confidential.

The Kentucky Supreme Court rejected these arguments on the grounds that the incriminating statements made by Sanborn to Reverend Brown were made without a clear understanding that they were confidential. The Kentucky court's factual and legal basis for that holding was explained as follows:

> Bette Niemi, defense counsel at the first trial, testified that at the time Rev. Brown talked to appellant she believed she might have Brown testify offering a theological perspective on the death penalty. He agreed to do so if called. At a later date, Niemi decided not to call Rev. Brown and at that time told him his services would no longer be required. It is clear from the record on this appeal that at the first trial it was not made clear that Rev. Brown was only meant to be a consultant for the appellant's defense. It was in fact contemplated that he would be an expert witness called to discuss the death penalty and any remorse shown by the appellant. Because such was the case, the appellant cannot now invoke an attorney–client privilege to disallow Rev. Brown's testimony.[10]

*Sanborn II*, 892 S.W.2d at 550. Hence the Kentucky court held, as a matter of state law, that the statements made by Sanborn to Reverend Brown did not fall within the scope of the attorney–client or priest–penitent privileges. Because the court did not apply federal law in doing so, we review this issue to determine if it acted "contrary to" clearly established federal law.[11]

---

[10]The lack of an expectation of confidentiality was also the basis for the Kentucky Supreme Court's determination that no interference with that state's priest–penitent privilege had occurred. *Sanborn II*, 892 S.W.2d at 550.

[11]Sanborn also attempts to argue that the Kentucky Supreme Court based its decision on an unreasonable finding of fact, to wit, that Sanborn's statements to Reverend Brown occurred before the time that Brown was no longer considered a potential witness by the defense team. The district court appears to have concluded that at least some of those statements did occur after Niemi decided not to call Brown as a witness. *See Sanborn IV*, 2007 WL 495202, at *12 (concluding that Brown continued to speak with Sanborn after the January 1984 decision not to use Brown as an expert, but "only for the purpose of praying with and ministering to Sanborn.") "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance," however. *Wood v. Allen*, 130 S. Ct. 841, 849 (2010). In our de novo review of Sanborn's habeas petition, we hold that the Kentucky Supreme Court's determination as to the timing of Sanborn's statements is not unreasonable. Sanborn argues that Brown remembered Sanborn making his statements after the testimony of a pathologist, and that therefore the statements must have been made after Brown was no longer being considered as an expert witness because (1) the pathologist, Barbara Weakley-Jones, testified at trial; and (2) Niemi testified that she told Brown that he would not be used as an expert witness "before the trial actually started." Sanborn ignores the fact that the pathologist *also* testified at a pre-trial hearing, at a time when no evidence indicates that Brown was not still being considered as a witness. Moreover, Niemi testified that Brown and Sanborn had *no* in-depth conversations once Sanborn's first trial began. Given that evidence, it would not be unreasonable for the Kentucky Supreme Court to conclude that the statements in question were made after the pathologist testified at the pre-trial hearing.

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  Thus "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id.* at 67–68.  As a result, "errors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983).

To be sure, "[i]t is not hyperbole to suggest that the attorney–client privilege is a necessary foundation for the adversarial system of justice." *In re Lott*, 424 F.3d 446, 450 (6th Cir. 2005).  Nevertheless, the "attorney-client privilege is a creation of the common law, not the Constitution." *Lange v. Young*, 869 F.2d 1008, 1012 n.2 (7th Cir. 1989).  As such, a violation of the attorney–client privilege is not *itself* a "violation[] of the United States Constitution or its laws and treaties," as is required by § 2254 before we may issue habeas on a given claim.  *See ibid.* ("Even if a violation of the attorney-client privilege occurred, this violation alone would be insufficient grounds for [habeas] relief.").  The same may also be said for the priest–penitent privilege, saving only that, unlike the attorney–client privilege, it is not even a creation of the common law.  *See Cox v. Miller*, 296 F.3d 89, 102 (2d Cir. 2002) (tracing the origins of the cleric–congregant privilege from the Catholic sacrament of Penance, and observing that "authorities generally agree" it was not a common-law rule in either England or in the United States).  Nor has the Supreme Court said differently.  Thus Sanborn cannot argue that any violation of the Kentucky attorney–client or priest–penitent privileges is sufficient grounds for habeas relief *per se*.

Nevertheless, if a state evidentiary ruling is "so egregious that it results in a denial of fundamental fairness," it may violate the Due Process Clause of the Fourteenth Amendment and warrant habeas relief.  *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  Though Sanborn argues vigorously that this is just such a case, we disagree.

Sanborn points to the lack of evidence apart from Reverend Brown's testimony that Heilman was alive at the time of penetration and contends that "[t]he damaging

nature of [Reverend Brown's] testimony rendered the entire trial fundamentally unfair." Cross-Appellant's Br. at 49. But mere prejudice to a defendant does not mean that such prejudice is *unfair*; indeed, "*all* evidence tending to prove guilt is prejudicial to a criminal defendant. If it were otherwise, the State would not produce it as evidence and the court would not admit it as relevant." *Bey v. Bagley*, 500 F.3d 514, 522 (6th Cir. 2007). In truth, clearly established federal law provides that, for prejudice to be unfair in the constitutional sense, it must fit within a very narrow category of infractions. As the Supreme Court has explained:

> Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. We, therefore, have defined the category of infractions that violate "fundamental fairness" very narrowly. As we observed in [*United States v.*] *Lovasco*, [431 U.S. 783 (1977)][,] [j]udges are not free, in defining "due process," to impose on law enforcement officials their personal and private notions of fairness and to disregard the limits that bind judges in their judicial function. They are to determine only whether the action complained of violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency.

*Dowling v. United States*, 493 U.S. 342, 352–53 (1990) (citations, some quotation marks, and alteration marks omitted).

The Kentucky Supreme Court's decision was not contrary to *Dowling*. Its rejection of Sanborn's argument was predicated on its determination, as a matter of state law, that neither Kentucky's attorney–client privilege nor its priest–penitent privilege extended to Sanborn. That determination, in turn, was based on a factual finding supported by the lower court record that the statements in question were made at a time when it was contemplated that Reverend Brown would be testifying as an expert witness, and thus Sanborn had no expectation that they would remain confidential. It is no offense to the "fundamental conception[] of justice which . . . define[s] the community's sense of fair play and decency" to admit into evidence the statement of a defendant when the defendant had no expectation that it would remain confidential. To that extent, Sanborn's true complaint is that he disagrees with the Kentucky courts as to the

admissibility of his statements.  As explained above, this is a matter over which we have no authority; as a state-court interpretation of a state evidentiary rule, it forms no basis for habeas relief.

B

State interference with the attorney–client relationship may implicate constitutional issues other than the Fourteenth Amendment's Due Process Clause.  In some instances, such interference may rise to the level of impermissibly denying a defendant his Sixth Amendment right to counsel.  *See Gideon v. Wainwright*, 372 U.S. 335, 342–43 (1963).  Clearly established federal law requires that, for such an argument to succeed, Sanborn must establish both that the government impermissibly intruded into the attorney–client relationship and that prejudice resulted from that intrusion. *Weatherford*, 429 U.S. at 550–59.

On appeal, Sanborn argues that intrusion into this relationship existed "because Reverend Brown was a representative of defense counsel and communications made to the Reverend after he was informed he would not be used as a witness were privileged." Cross-Appellant's Br. at 53.  This is the same argument Sanborn relied upon to claim that the Commonwealth interfered with his Fourteenth Amendment right to Due Process, however, and fails for the same reasons.  It was not unreasonable for the Kentucky court to conclude that the communications in question did *not* occur after the decision had been made that Reverend Brown would not be used as a witness; hence, there was no intrusion into the attorney–client privilege and no violation of Sanborn's Sixth Amendment rights.

C

Sanborn next argues that the evidence at his second state trial was constitutionally insufficient to prove beyond a reasonable doubt the existence of the aggravating factors of rape or sodomy.

Initially, we note that this panel issued a Certificate of Appealability on two claims related to this issue.  As numbered by the district court in *Sanborn IV*, these were

claims five and six: whether "[Sanborn's] conviction for rape and sodomy at the second trial was not proper, because there was no evidence to corroborate Brown's testimony that Ms. Heilman was alive when she was sexually abused," and whether, "even if there was corroborating evidence that Ms. Heilman was alive, there was insufficient evidence at the second trial to support his conviction for rape and sodomy." *Sanborn IV*, 2007 WL 495202 at *5.

1

On appeal, Sanborn takes a two-pronged approach to claim five by arguing that habeas is warranted because (1) Reverend Brown's testimony was inadmissible in the absence of corroboration, and (2) without Reverend Brown's testimony, there was insufficient evidence for a jury to conclude that he raped or sodomized Heilman (as opposed to abusing her corpse).

A conviction is supported by sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).[12] Yet even that level of deference does not adequately describe the burden Sanborn faces in advancing this argument on appeal, because we must also review this claim through the lens of AEDPA; thus the question that faces us is ultimately whether "it was objectively unreasonable for the [state court] to conclude that a rational trier of fact, after viewing the evidence in the light most favorable to the [S]tate, could have found that [Sanborn] committed the essential elements of [the crime charged] beyond a reasonable doubt." *Pinchon v. Myers*, 615 F.3d, 631, 643 (6th Cir. 2010) (quoting *Nash v. Eberlin*, 258 F. App'x 761, 765 (6th Cir. 2007) (first, second, and fourth alterations in *Pinchon*).

Sanborn disputes this "second level" of deference, arguing that we ought to review this question de novo because the Kentucky Supreme Court did not address its

---

[12]This standard also applies to determinations that an aggravating circumstance was present in a capital-murder case. *Lewis v. Jeffers*, 497 U.S. 764, 781–82 (1990).

merits and that therefore this is not a matter that has been "adjudicated on the merits in State court proceedings," the predicate for AEDPA's applicability. *See Nields v. Bradshaw*, 482 F.3d 442, 449–50 (6th Cir. 2007) ("We . . . apply the de novo standard of review where the . . . state courts have not ruled on the merits of a particular claim in [a habeas] petition.").

We disagree. It is true that the Kentucky Supreme Court's decision on Sanborn's direct appeal did not explicitly address his sufficiency-of-the-evidence argument; instead, it disposed of it *en suite* with several other claims by pointing out that

> Some thirty assignments of error were set out in the appellant's brief, of which eight to ten were emphasized at oral argument. Although we have considered each claim carefully, we found none to amount to prejudicial error so as to require reversal of the convictions or sentences.

*Sanborn II*, 892 S.W.2d at 546. Such a disposition, however perfunctory, is nevertheless "on the merits." A finding that a claim does not "amount to prejudicial error so as to require reversal" is directed not to a procedural infirmity or other non-merits-based reason for dismissing that claim, but rather goes to the question of whether error occurred at all—the quintessence of an "on the merits" determination. Hence this issue is one in which the Kentucky courts have ruled on the merits without articulating their analysis, a situation in which we apply so-called "modified AEDPA deference"; that is, we "conduct an independent review of the record and applicable law to determine whether, under the AEDPA standard, the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Howard v. Bouchard*, 405 F.3d 459, 467 (6th Cir. 2005).

Having conducted such an independent review, we conclude that this claim fails. Sanborn's contention that Reverend Brown's testimony was inadmissible for lack of corroboration as a matter of state law, even if true, is irrelevant. Recently, in *McDaniel v. Brown*, 130 S. Ct. 665 (2010), the Supreme Court summarized the proper analytical framework for a sufficiency-of-the-evidence claim as follows:

> An "appellate court's reversal for insufficiency of the evidence is in effect a determination that the government's case against the defendant was so lacking that the trial court should have entered a judgment of acquittal." *Lockhart v. Nelson*, 488 U.S. 33, 39 (1988). Because reversal for insufficiency of the evidence is equivalent to a judgment of acquittal, such a reversal bars a retrial. *See Burks v. United States*, 437 U.S.1, 18 (1978). To "make the analogy complete" between a reversal for insufficiency of the evidence and the trial court's granting a judgment of acquittal, *Lockhart*, 488 U.S. at 42, "a reviewing court must consider all of the evidence admitted by the trial court," *regardless whether that evidence was admitted erroneously*, *id.* at 41.

*Id.* at 672 (citations partially omitted) (emphasis added). In other words, Sanborn's burden on the sufficiency-of-the-evidence claims is not to demonstrate that insufficient *properly* admitted evidence existed to demonstrate that Heilman was alive at the time of Sanborn's unlawful penetration, but rather whether any rational trier of fact could have concluded that such was the case after considering everything admitted into evidence by the trial court, whether it was otherwise proper or not. Because Sanborn's fifth claim depends on his assertion that the evidence of his guilt was insufficient *without* Brown's testimony, it necessarily fails because consideration of that testimony is required for purposes of a sufficiency-of-the-evidence evaluation.

2

Hence we reach the habeas petition's sixth claim, which argues that, even in the presence of evidence corroborating Reverend Brown's testimony, insufficient evidence existed to convict Sanborn. Although originally stated in such a way as to presume that corroboration of Brown's testimony was *necessary*, which—as explained above—is not required under *McDaniel*, we think it sufficiently obvious that Sanborn's real argument here is that insufficient evidence supported the finding that he raped and sodomized Heilman even if one considers Brown's testimony.

Even thus construing his claim, however, Sanborn fails to demonstrate that habeas relief is warranted. We reach this conclusion in the first instance because the argument was waived for failure to raise any form of it in Sanborn's initial brief on appeal. Instead, that brief focused exclusively on whether Brown's testimony was

admissible, and whether, if that testimony were *excluded*, sufficient evidence existed to conclude that Sanborn's sexual activity occurred before Heilman's death.  These are obviously not questions that go to the issue of whether that same conclusion could be reached by any rational trier of fact if Brown's testimony were *included*.  Sanborn does argue in his *reply* brief that "even if this [c]ourt elects to consider Rev. Brown's testimony in determining whether there was sufficient evidence of rape, Sanborn's statements to Rev. Brown are themselves insufficient to support his conviction." Cross-Appellant's Reply Br. at 15.  We have consistently held, however, that arguments made to us for the first time in a reply brief are waived.  *See Am. Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004).  Sanborn sought an expansion of the COA to include this issue, yet elected not to pursue it in his opening brief; we see no reason to excuse his failure to do so.

Yet even if we were to indulge the argument, it would fail.  Sanborn points to no evidence introduced at trial that conclusively proved Heilman was dead at the time he unlawfully penetrated her.  He instead urges us to consider (1) the existence of postmortem stab wounds that penetrated Heilman's clothing, (2) the existence of vegetation found inside Heilman's vagina, (3) the presence of pubic hairs on her mouth and nose, which he claims would have been dislodged if her body had been moved after the unlawful penetration, (4) the lack of blood spatter at any location other than Heilman's driveway, and (5) the lack of a sex-related injury to, or semen in, the victim's mouth or vagina.  At their weightiest, however, these are arguments that merely hint at what Sanborn asks us to believe; indeed, Sanborn himself variously characterizes them as "suggest[ing]," "impl[ying]," or "support[ing] the conclusion that" Heilman had died before the rape and/or sodomy could occur.  Even were we to accept Sanborn's argument that, taken together, these constituted "substantial evidence . . . that Heilman was dead when the sexual activity occurred," none of them, together or separately, would require a rational trier of fact to reach that conclusion when considered in conjunction with the evidence of the conversation between Sanborn and Brown.  At trial, the Commonwealth contested the factual basis and/or the import of each of Sanborn's arguments.  But the dead do not scream.  A rational juror who believed Sanborn's statement to Brown would

thus be equally rational in concluding that the evidence to which Sanborn now points did not foreclose the possibility that Barbara Heilman had still been alive when Sanborn sexually penetrated her.

D

Sanborn next argues that habeas relief is warranted because his second state court trial violated his Fifth Amendment rights by placing him in double jeopardy.

As in his sufficiency-of-the-evidence claims, Sanborn argues that this is not a matter that has been "adjudicated on the merits in State court proceedings." For the same reasons set forth in Part IV-C of this opinion, he is mistaken; we evaluate this claim using modified AEDPA deference.

Sanborn's double jeopardy claim fails. The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. It applies to the States via the Fourteenth Amendment. *See Benton v. Maryland*, 395 U.S. 784, 794 (1969). The Double Jeopardy Clause "protect[s] a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions." *United States v. Dinitz*, 424 U.S. 600, 611 (1976). It also protects a defendant's "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter*, 336 U.S. 684, 689 (1949).

What the Double Jeopardy Clause manifestly does *not* do, however, is protect a defendant from retrial after he has succeeded in obtaining a reversal on appeal because of errors committed at trial, as distinct from a reversal that was based on the grounds that insufficient evidence existed to support the judgment of the trial court. *Burks v. United States*, 437 U.S. 1, 15–16; *Patterson v. Haskins*, 470 F.3d 645, 657 (6th Cir. 2006). Sanders argues that the same considerations that protect a criminal defendant from governmental actions intended to provoke trial-level mistrial requests counsel in favor of extending the Fifth Amendment's shield against double jeopardy to situations in which no mistrial is declared, but in which an appellate court nevertheless holds those

actions to have rendered the trial constitutionally unfair. According to Sanborn, holding otherwise would effectively punish a defendant for a trial court's mistake, because, per *Dinitz*, a mistrial declared at trial at the defendant's behest can be the basis for a subsequent double jeopardy claim if the motion for a mistrial was intentionally provoked by the prosecution.

But such an extension of the Double Jeopardy Clause has never been made, either in our circuit or by the Supreme Court of the United States. We, in fact, have explicitly rejected Sanborn's argument for some time. *See Gully v. Kunzman*, 592 F.2d 283, 288–90 (6th Cir. 1979). In *Gully*, we examined the double jeopardy claim of two brothers who had originally been convicted of murder but whose convictions had been reversed on appeal for reasons unrelated to the sufficiency of the evidence. *Id.* at 285. In determining that a retrial would not offend the Double Jeopardy Clause, we concluded that:

> [Terry Lee Gully] argues that the State should be barred from retrying him because its own misconduct led to the reversal of his first conviction. Even accepting that characterization of the trial error which caused the appellate reversal, it would not affect the State's right to retry him. His attempt to analogize his situation to cases where retrial has followed a mistrial provoked by prosecutorial misconduct is unavailing. In such cases, retrial is disapproved principally because the misconduct resulting in a mistrial has deprived the defendant of the valued right to have his trial completed by a particular tribunal. Terry Lee Gully's first trial proceeded all the way to verdict, and, consequently, he fully enjoyed that right.

*Id.* at 289–90 (citations, internal quotation marks, and alteration marks omitted). It is just so in Sanborn's case. He, too, argues that the Commonwealth's misconduct led to the reversal of his first conviction; he, too, attempts to analogize that reversal to a mistrial provoked by prosecutorial misconduct; yet he, too, fully enjoyed the right to have his first trial proceed all the way to a verdict.

Moreover, even were our law extended in the way Sanborn would prefer, his claim would still fall short because the Supreme Court has held that retrial in cases in which the defense has moved for a mistrial is only barred by the Double Jeopardy Clause

when the prosecution's misconduct is *intended* to provoke a motion for mistrial. *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982). Although the Kentucky Supreme Court found the prosecutorial misconduct in Sanborn's first trial to have been *itself* intentional, there is absolutely no indication that the misconduct was intended to provoke a motion for mistrial, and thus there is no reason to believe that the prosecution sought to "subject [him] to the substantial burdens imposed by multiple prosecutions" contemplated by *Dinitz*. Sanborn points to the Kentucky Supreme Court's characterization of the Commonwealth Attorney's appeal to the sympathies and prejudices of the jury as being "calculated to deny the accused's right to a fair trial and due process of law," *Sanborn I*, 754 S.W.2d at 543, along with the pervasiveness of the prosecutor's misconduct and a lack of evidence that Barbara Heilman was alive at the time she was sexually violated by Sanborn, and argues that they demonstrate the prosecution's intent to goad Sanborn into moving for a mistrial. We disagree; none of these are particularly indicative of such an intent. Underhanded and constitutionally repugnant as these tactics might have been, any one of them, or all of them together, might just as likely have been the consequence of a Commonwealth Attorney's attempt to win a guilty verdict at that trial. Without more, they simply do not demonstrate a desire on the part of the prosecution to elicit a motion for a mistrial.

The Kentucky Supreme Court's decision was not contrary to the Fifth Amendment, the holding of *Dinitz*, or any other clearly established federal law. Habeas cannot be justified on those grounds.

E

In his final argument on appeal, Sanborn contends that habeas relief is warranted in his case because his Sixth Amendment right to effective assistance of counsel was violated at the guilt phase of his trial.

The Sixth Amendment guarantees a criminal defendant "the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. That right is satisfied, however, only by the *effective* assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). A convicted defendant who seeks to demonstrate that his

counsel's performance was ineffective to the point of violating the Sixth Amendment must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

1

Performance of counsel is constitutionally deficient only if it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (citation and internal quotation marks omitted).

Sanborn argues that the defense offered by his trial counsel was incoherent to the point of constitutional deficiency. According to Sanborn, counsel's opening argument to the jury advancing the theory that Sanborn acted under extreme emotional disturbance—and conceding that Sanborn had, in fact, killed Barbara Heilman—ignored the fact that a critical portion of the testimony of the expert retained to buttress this theory depended upon hearsay and was likely to be excluded from the guilt phase of the trial. Thus when that testimony was, in fact, excluded, Sanborn was left defenseless.

The Kentucky Supreme Court addressed Sanborn's ineffective-assistance argument when it reviewed the denial of his state-law petition for postconviction relief pursuant to Kentucky Rule of Criminal Procedure 11.42. *Sanborn III*, 975 S.W.2d at 912. In so doing, the Kentucky court noted that attorney Tustaniwsky sent Sanborn to defense expert Dr. Johnson for evaluation and obtained a court order requiring Dr. Johnson's presence at Dr. Skelton's interviews, both actions taken in preparation for the contemplated EED defense. The Kentucky court also observed that the subsequent exclusion of Dr. Johnson's testimony as to the existence of a "triggering event" for Sanborn's EED defense was based on there being no factual foundation for Dr. Johnson's knowledge of that event other than Sanborn's own statements to him (as opposed to, for example, any failure by his attorney to elicit testimony as to another

basis Dr. Johnson might have had for that knowledge). *Ibid.*[13] Hence the basis for the Kentucky court's decision was that Sanborn had failed to demonstrate the "deficiency" requirement of *Strickland*, and we review that rationale for the decision accordingly under the "unreasonable application" clause of the AEDPA standard. The question, therefore, is whether the Kentucky Supreme Court was objectively unreasonable in its application of *Strickland* to the facts of Sanborn's case to hold that Sanborn had not overcome the strong presumption that Tustaniwsky's actions were sound trial strategy.

At bottom, Sanborn's argument is that Tustaniwsky was constitutionally deficient in failing to anticipate that Dr. Johnson's testimony as to the presence of "triggering event" would be ruled inadmissible hearsay. Yet it is far from clear that Tustaniwsky's plan to have Dr. Johnson testify was a dead letter from its conception. The trial transcript reflects that the trial judge spent a significant amount of time listening to arguments from both sides as to the permissible extent of Dr. Johnson's testimony, a fact that cuts against Sanborn's argument that the eventual outcome of the argument was so obvious that Tustaniwsky's failure to anticipate it was constitutionally deficient. Moreover, even after the nature of the proposed testimony and the relevant Kentucky case law had been made clear to Judge Shadoan, he *explicitly* described the question as novel, saying "[n]ow what I need is a case that has that the psychologist can testify to [the existence of a triggering event]. I don't know, *I've never seen anything like this. This is something new*." (emphasis added); *id.* Judge Shadoan later commented that "I'm just trying to get something I don't understand. I've never seen this before."

Though Sanborn argues that the Kentucky Supreme Court's decision in *Stanford v. Commonwealth*, 793 S.W.2d 112 (Ky. 1990), made "the exclusion of the expert's hearsay testimony . . . entirely foreseeable under the case law in existence at the time,"

---

[13]Dr. Johnson's account of Sanborn's statement to him as to the triggering event was offered "on avowal," which, in Kentucky at the time of the trial, was a process by which excluded testimony could be placed into the record outside the presence of the jury for the purpose of facilitating review of the ruling excluding that evidence. *See Eilers v. Eilers*, 412 S.W.2d 871, 872 (Ky. 1967) (discussing Kentucky's avowal rule, Ky. R. Civ. P. 43.10, *deleted by* Order 2004-5, effective Jan. 1, 2005). According to Dr. Johnson's account, Sanborn claimed that he had been drinking a great deal on the day in question. Sanborn also claimed to Johnson that Heilman had made sexual advances to Sanborn after agreeing to drive him home, but that Sanborn had refused; Heilman then began to tease Sanborn about his stuttering, at which point Sanborn "lost control." *See Sanborn IV*, 2007 WL 495202, at *16.

Cross-Appellant's Br. at 75 n.16, we note that *Stanford* was not a decision that directly controlled the issue before the judge in Sanborn's case. Rather, *Stanford* involved EED evidence that had been excluded primarily because the defendant had not complied with a requirement of Kentucky law that "a defendant who intends to introduce evidence of his mental illness or insanity . . . file a written notice of his intention to introduce such evidence at least twenty days before trial." *Stanford*, 793 S.W.2d at 115 (citing Ky. Rev. Stat. § 504.070(1)). Further, although the *Stanford* court noted that the evidence "was subject to exclusion for hearsay and for failure to lay a proper foundation for its admission," *ibid.*, such a holding was factually distinguishable from Sanborn's case because the evidence in *Stanford*, even if admitted, was held to have been legally insufficient to establish the existence of a triggering event. *Ibid.* And ultimately, the trial transcript in Sanborn's case reflects that Judge Shadoan did *not* view the issue as one controlled by precedent:

> MR. TUSTANIWSKY: But, your Honor, what we are going to do is certainly not a novel proposition. This has been done many times throughout the Commonwealth.
>
> THE COURT: Where? Show me one case, please.
>
> . . . .
>
> THE COURT: I would like to see a Supreme Court or a Court of Appeals ruling that indicates that a psychologist can produce evidence and then testify that act is the extreme emotional disturbance.
>
> [Co-counsel for Sanborn] MS. BOYCE: There is no opinion one way or another that says it can or cannot come in that way. It did not come up to the court. The issue has not been ever presented.
>
> MR. TUSTANIWSKY: Nobody's ever challenged it in court because it's done commonly.
>
> THE COURT: Well, it's challenged now and I have to rule on it. It's not just a simple little case. It's very serious. I'm aware of that.

Even further, when Sanborn's counsel complained to Judge Shadoan that no case permitted the exclusion of an expert psychologist's testimony as to the existence of a triggering event, the judge replied, "[y]ou've got one *now*. . . . You've got one right now

that says it until otherwise." (emphasis added). It was not objectively unreasonable for the Kentucky Supreme Court to conclude that counsel's failure to anticipate a ruling on an issue that the judge himself recognized as complicated and novel was not a deficiency of constitutional dimension.

Once Dr. Johnson's testimony had been ruled inadmissible, moreover, it was not constitutionally deficient for Tustaniwsky to have abandoned the EED defense at the guilt phase. "[T]he Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." *United States v. Cronic*, 466 U.S. 648, 657 n.19 (1984). Sanborn does not dispute that Kentucky law required some evidence of a "triggering event" in order to successfully mount an EED defense at the guilt phase, nor does he argue that he himself ought to have taken the stand to testify as to the existence of the alleged triggering event, nor does he contend that evidence of a triggering event could have been introduced via some other source. Faced with an evidentiary ruling that precluded the use of the EED defense at the guilt phase, Tustaniwsky appears to have quite rationally decided not to call Dr. Johnson to testify until the penalty phase, at which point evidence of a triggering event was not required. *See Florida v. Nixon*, 543 U.S. 175, 191 (2004) ("In [some death penalty] cases, 'avoiding execution [may be] the best and only realistic result possible.' Counsel therefore may reasonably decide to focus on the trial's penalty phase at which time counsel's mission is to persuade the trier that his client's life should be spared.") (citations omitted).[14]

---

[14]On appeal, Sanborn argues that *Nixon* is inapposite because that case involved an attorney who conceded guilt with the purpose of preserving his credibility, the better to argue for leniency in the penalty phase. Sanborn contends that his attorney, by contrast, conceded guilt in order to argue a foredoomed EED defense. In this case, however, this is a distinction without a difference. Even a successful EED defense would have required precisely the same admission that would have been made by an attorney seeking to "focus on the trial's penalty phase" in an attempt to convince the jury to spare Sanborn's life. In other words, given that a decision to plead guilty in order to present an EED defense at the penalty phase is within the presumption of reasonability, it follows that a decision to make the same argument at the guilt phase—as long as it was without prejudice to Sanborn's ability to make it at the penalty phase, as was the case here—would also be within that presumption even if the admissibility of the EED evidence at the guilt phase was unlikely.

Sanborn's trial counsel initially sought to present a defense that hinged on the testimony of a particular witness. Though the admissibility of portions of that testimony may have been in doubt, the judge in his case considered the question complex enough to warrant arguments taking up dozens of pages of transcript, ultimately resulting in a decision made without reference to controlling authority. Nothing in the record suggests that this approach fell outside the presumption of sound trial strategy, and, once that strategy was derailed, counsel took the rational option of presenting his EED defense at the punishment stage. Because counsel's actions were not constitutionally deficient, Sanborn's ineffective-assistance argument fails.

2

Sanborn's ineffective-assistance argument also fails because he cannot demonstrate prejudice. Because the Kentucky Supreme Court did not reach the question of prejudice with respect to Sanborn's counsel's alleged deficiency in the presentation of his EED defense, we review this portion of the *Strickland* requirement de novo.

Deficient performance of counsel only results in prejudice if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Sanborn argues first that Tustaniwsky's concession of guilt during opening remarks was presumptively prejudicial as a complete abdication of the responsibility to mount a defense. *See Cronic*, 466 U.S. at 658–60. We disagree. Under *Cronic*, some forms of deficient representation are indeed presumptively prejudicial, but only in "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," such as the complete denial of counsel or a failure of counsel to subject the prosecution's case to meaningful adversarial testing. *Id.* at 658–59. No such circumstances were present in Sanborn's case; his attorney may have lost an admissibility battle critical to Sanborn's defense, but he nevertheless fought that battle, as well as arguing that Heilman was dead when the sexual assaults occurred, presenting witnesses, objecting to the prosecution's opening and closing arguments, and

twice moving for mistrial. Thus we proceed to the question of whether Sanborn has shown that Tustaniwsky's alleged deficiencies prejudiced Sanborn in fact.

And indeed, having carefully reviewed the record, we conclude that he has not. Sanborn first suggests Tustaniwsky's failure to "develop exceptions to the hearsay rule to fight for the testimony to be allowed," to seek independent evidence to corroborate Sanborn's statements as to the alleged triggering event so that they would not be barred as hearsay, or to "adequately plan[] for the contingency of presenting the EED defense without Dr. Johnson's testimony" prejudiced him in that, as a consequence, his EED defense was not considered at the guilt stage. But Sanborn points to no such exceptions in the hearsay rule, and no such independent corroborating evidence, and no way in which the EED defense might have proceeded at all without the testimony of Dr. Johnson.[15]  Because it is Sanborn's responsibility to demonstrate that, had Tustaniwsky taken those steps, "the result of the proceeding would have been different," Sanborn's failure to explain how, precisely, Tustaniwsky could have proceeded along any of those lines is fatal to his argument.

Sanborn also claims that Tustaniwsky could have researched "other plausible legal defenses," again without specifying what those might be, or explaining how they would have altered the outcome of his trial. Had Tustaniwsky not presented the EED defense, of course, he might have contested the question of whether Sanborn had actually committed the acts that led to his convictions, but on that question the evidence was overwhelming. Heilman's blood was found in Sanborn's car, and on his hands, clothes, and knife. His hairs were found on her body. Scrapings from under Heilman's nails matched carpet fibers from Sanborn's car. Testimony from the investigating officers established that Sanborn told them that he knew the approximate location of Heilman's body and that she had been "hurt bad." Reverend Brown testified that Sanborn had confessed his guilt. Given those facts, and without any indication of how guilt might have been contested, Sanborn's current assertion that Tustaniwsky's decision

---

**15**Sanborn himself, of course, could have testified as to the existence of the triggering event, but doing so would have exposed him to cross-examination, and he does not argue on appeal that he himself should have taken the stand.

to pursue an EED defense at the expense of some other, unspecified, defense is unavailing.

Finally, Sanborn advances the theory that "[b]ut for defense counsel's decision to pursue an EED defense, Sanborn would not have been evaluated by Dr. Skelton," and therefore would not have been subjected to the damaging testimony from Dr. Skelton we discuss above. Dr. Skelton's testimony was permitted to rebut Dr. Johnson's testimony at the *penalty* phase of Sanborn's trial, because, unlike at the guilt phase, Kentucky law did not require that a defendant prove a "triggering event" for an EED episode. But again, Sanborn cannot demonstrate that the outcome of the proceedings would have been different but for that decision. Skelton did not testify at the guilt phase, so Sanborn was clearly not found guilty as a result of that testimony. While Dr. Skelton's testimony did obviously damage Sanborn's attempts to mitigate his sentence, moreover, he points to no such damage done to any mitigation attempt other than the EED defense itself; thus Sanborn appears to claim that "defense counsel's decision to pursue an EED defense" was prejudicial to his ability to pursue an EED defense. It needs hardly to be said that this is nonsensical.

## F

Because Sanborn cannot demonstrate that habeas relief is warranted on any of the grounds rejected by the district court, we affirm the judgment of the district court in Appeal No. 07-5310.

## V

For the reasons discussed above, we **REVERSE** the judgment of the district court insofar as it granted habeas relief to Parramore Sanborn. We **AFFIRM** the judgment of the district court in all other respects. Accordingly, we **REMAND** these causes to the district court with instructions to deny Sanborn's petition for a writ of habeas corpus.